CRAIG, STATE AUDITOR v. MERCY
HOSPITAL—STREET MEMORIAL.

In Banc. April 24, 1950.

No. 37689 (45 So. (2d) 809)

Suggestion of Error Overruled October 2, 1950. (47 So. (2d) 867)

428

John M. Kuykendall, Jr., Assistant Attorney General, for appellant.

Brunini, Brunini, & Everett, for appellee.

McGehee, C. J.

Upon the advice of the Attorney General, based upon an interpretation of the meaning of Section 66 of the Mississippi Constitution of 1890, as applied to the question at issue, the appellant, Carl N. Craig, as State Auditor of Public Accounts, refused to honor and pay a requisition of the Mississippi Commission on Hospital Care, for a warrant on the State Treasury, in favor of the appellee, Mercy Hospital—Street Memorial, of Vicksburg, Mississippi, and representing a part of a large grant of money which had been approved by such Commission in favor of the said hospital in the total sum of $214,000 from state funds, to be supplemented to the extent of $527,000 from federal funds to be paid to the hospital through the Commission, as per contract between them in connection with the long range statewide hospital plan to assist in the construction, erection, and equipping of hospitals, nurses' homes, health centers, clinics, and related facilities, that are publicly owned, operated, and controlled, or where the same are privately owned, op-

erated, and controlled on a strictly nonprofit basis, as defined by the Commission, and as provided by law.

Thereupon. the appellee, Mercy Hospital—Street Memorial, filed its petition for a writ of mandamus to compel the issuance of the warrant as aforesaid. To this petition the appellant, as such State Auditor, and represented by the Attorney General, filed an answer to the suit for mandamus on two defense grounds, (1) That the hospital involved is not eligible to receive such grant from the state appropriation of $4,750,000, made by Chapter 164, Laws of 1948, and from the federal funds allocated to the state, for the reason that the hospital corporation is not owned, operated, and controlled on a strictly nonprofit basis, within the meaning of Chapter 430, Laws of 1948, which is amendatory of Chapter 363, Laws of 1946, and the Act of Congress, 42 U. S. C. A. Section 291 et seq., which was enacted "to assist the several states to construct public and non-profit hospitals" and appropriated $300,000,000 of federal funds for such purpose.

(2) That the grant of the funds in question is a donation or gratuity for a sectarian purpose or use, and is therefore in violation of said Section 66 of the State Constitution, which reads as follows: "No law granting a donation or gratuity in favor of any person or object shall be enacted except by the concurrence of two thirds of the members elect of each branch of the legislature, nor by any vote for a sectarian purpose or use."

As to the first ground of defense above stated, a nonprofit hospital is defined in both the said Act of Congress and Chapter 430, Laws of 1948, as "[any hospital] owned and operated by a corporation or association no part of the net earnings of which inures, or may lawfully inure, to the benefit of any private shareholder, group, or individual."

The Mississippi Commission on Hospital Care found and adjudicated by resolution duly adopted that the appellee hospital comes within the definition of a nonprofit hospital, as above defined, and that said hospital

had agreed to the terms and conditions imposed by the said Act of the State Legislature of 1948, the material provisions of which were set forth in the contract executed and submitted by the hospital to the Commission so as to entitle it to the grant of funds in question as a part of the long-range state-wide hospital program contemplated by Chapter 363, Laws of 1946, as amended by the said Chapter 430, Laws of 1948.

As a consideration for the so-called "grant" of the funds in question, the appellee hospital obligated itself to maintain at least 10% of its bed capacity if needed for charity patients as provided for in the said Acts of the Legislature. It also agreed and contracted with the Commission, as provided for in said Chapter 430, Laws of 1948, that if, at any time within twenty years after the date of such grant, the hospital shall cease to be a nonprofit institution, or shall otherwise fail to meet the requirements of the Act, a lien in favor of the State shall attach to the property of the hospital, and that the State shall be entitled to recover the amount of money advanced by it to such institution, less reasonable depreciation as determined by agreement of the parties or the chancery court of the county in which such hospital or facility is located. It further covenanted and agreed that the hospital will be maintained as a privately owned nonprofit hospital and operated with a purpose of providing maximum hospital facilities to the citizenship of the State at minimum cost to the patient, as required by the statute authorizing such a grant of aid; and that said hospital and all of its facilities *"shall be available at all times as a part of the state-wide hospital program sponsored by the Commission and as a part of the state-wide teaching facilities for medical technicians, nurses, medical students, internes, and resident physicians and such other medical educational needs as the Commission may determine to be necessary or desirable; . . ."*. (Italics ours.) And the following is expressly admitted by the answer of the defendant in this case and it therefore

stands as a fact: "As a specific consideration for obtaining said funds Petitioner has entered into and executed a formal covenant and agreement with the said Commission on Hospital Care insuring said Commission of definite required facilities and of certain controls and services in return for the money to be made available to the Petitioner."

It will therefore be seen that while the statutes in question refer to the allocation of the funds as being a "grant", the express provision of the statues fully discloses that the allocation of funds is not to be made as a grant in the sense of being a gift. In fact a grant of personal property is defined in Black's Law Dictionary, Second Edition, 547, as "a method of transferring personal property, distinguished from a gift by being always founded on some consideration or equivalent. 2 Bl. Com. 440, 441." And as applied to real estate, a grant is a generic term applicable to all transfers of such property, whether with or without consideration.

The record is silent as to any finding by the Mississippi Commission on Hospital Care on the issue as to whether or not the appellee, Mercy Hospital—Street Memorial, had applied for the grant for a sectarian purpose or use, within the meaning of said Section 66 of the State Constitution. Assuming that there was no donation or gratuity involved, in view of the consideration to be received by the State in return for the so-called grant under the terms of the contract hereinbefore mentioned, there would have been no need for a finding by the Commission that the funds were not being sought for a sectarian purpose or use, the Constitutional provision in question only prohibiting a "donation or gratuity" for such a purpose or use. However, the circuit court which heard the cause on both oral and documentary evidence without the intervention of a jury, not only sustained the findings of the Commission on Hospital Care to the effect that the appellee is a nonprofit hospital, no part of the net earnings of which inures, or may lawfully inure, to

the benefit of any private shareholder, group, or individual, but the court further found from the proof that the grant was neither a donation nor gratuity, and that it was not for a sectarian purpose or use. The court therefore ordered the writ of mandamus to be issued as prayed for and granted this appeal from its said judgment with supersedeas.

To support the finding of the Commission and the trial court, the proof discloses (and there is no conflict in any of the evidence in the record before us) that the appellee hospital was originally incorporated as the Vicksburg Sanitarium on April 13, 1903, for a period of 50 years. The founder thereof, Dr. D. P. Street, personally guaranteed to the stockholders an 8% dividend upon their investment and he continued to pay the same until about the year 1921 or 1922, when he notified the stockholders that he would be unable to continue paying a dividend and at the same time improve and maintain the facilities of the hospital. He thereupon refunded to the stockholders their investment and took up the stock. Eventually this stock came to be owned by his brothers, Drs. George M. and Augustus Street, but no dividends or other payments in the nature of profits of any kind have been paid to the stockholders since the year 1921 or 1922. On the contrary, all of the net earnings of the hospital have been invested since that time in the development and improvement of its facilities and physical properties.

The corporation, known as the Vicksburg Sanitarium, amended its charter during the year 1935 so that it would contain, among other provisions, the following: ''Provided, however, that all of the income and revenue derived from the hospital or sanitarium, and nurses' school and home, shall be used and devoted exclusively to and for the purposes of said hospital or sanitarium and nurses' home, and no part of the same for profit; and no dividends shall be declared or paid to the stockholders; and that said corporation, as now and heretofore may

maintain in said hospital or sanitarium, one or more charity wards that are for charity patients."

On July 7, 1943, all the corporate stock of the Vicksburg Sanitarium, aggregating 500 shares of the par value of $100 each, was acquired for the sum of $50,000, the face value thereof, by the Sisters of Mercy of Vicksburg, a corporation which was organized and chartered on November 7, 1861, under the laws of this State. The corporate members of the latter corporation are individually members of the Order, Sisters of Mercy, all of whom are of the Catholic faith.

After the acquisition of the corporate stock of the Vicksburg Sanitarium, the charter thereof was amended on August 5, 1943, so as to change the name to Mercy Hospital—Street Memorial, for the reason that the Vicksburg Sanitarium was originally founded by Dr. D. P. Street, as aforesaid, and 499 shares of the corporate stock thereof were owned in 1943 by Drs. George M. and Augustus Street when the hospital was sold in 1943 by the transfer of such stock for a small per cent of its then value, after the Drs. Street had rendered distinguished services therein to suffering humanity for nearly 40 years; and for the further reason that the Drs. Street were continuing to devote their best efforts to the success of the hospital under its new management, in which they were to play and are still playing a most important part. The Drs. Street are members of the Protestant faith.

The sale to the Sisters of Mercy of Vicksburg in 1943, including the land, buildings, and equipment of the hospital, was accompanied merely by the assignment of the corporate stock, and the present holders thereof are the 7 members of the corporation, Sisters of Mercy of Vicksburg, and their successors, who each have an equal vote and interest with the other in regard thereto.

The hospital has been granted tax exemption as a nonprofit hospital for a number of years.

The resolution adopted by the Commission on Hospital Care, which approved the grant to the appellee hospital,

recites: ''The hospital to be so constructed will be a non-profit institution owned and operated by a corporation, no part of the earnings of which inures, or may lawfully inure, to the benefit of any private group or individual; that said corporation is now engaged in the operation of a hospital which is a non-profit institution of the character described . . .''.

In the instant case, if we consider a gain or increase in the capital assets as a profit, the corporate charter of Mercy Hospital—Street Memorial would prohibit such profit or gain from ever being distributed to any shareholder, group, or individual.

While dividends and profits are not synonymous, the former being paid out of the latter, the fact remains that no part of the *net earnings* of this hospital have inured to anyone, but the earnings have been used for the enlargement and improvement of the physical properties and other facilities, and with the necessary result of course that the corporate stock has greatly enhanced in value and to the extent that the land, buildings, and other equipment and other assets are now worth at least from one-fourth to one-half million dollars. However, it is contemplated that under the contract between the hospital and the Mississippi Commission on Hospital Care, all of the assets of the hospital are to go into the new hospital building to be constructed from state and federal funds; that is to say, all of the assets of the hospital corporation, or the proceeds of any sale thereof, are to go into the cost of the new hospital, and no benefit therefrom is to accrue to the stockholders.

But it is argued that the appellee hospital is not a non-profit institution because it has outstanding stock in the hands of shareholders who would ordinarily be entitled to those assets upon the expiration of its charter in 1953, or upon its dissolution at any future time. But it may be observed that the same result would follow if the hospital was a nonstock corporation. Woodville Lodge v. Poole, 190 Miss. 798, 1 So. 2d 780. At any rate, in the statute

providing for the grant of the funds in question, the condition is that if *net earnings* do not inure, or may not lawfully inure, to the benefit of any shareholder, the hospital may qualify as a. nonprofit hospital. The statute does not require that the hospital shall be of such character that. no part of its capital assets may inure to its shareholders upon dissolution. Net earnings is the income over expenditures. It is in contradistinction to corporate property and capital assets. Then, too, a nonprofit hospital now has a well-defined meaning under the decisions of this court in regard to tax exemption and a number of them have been held to be such and entitled to exemption from taxation under statutes which are to be strictly construed against the applicant for such tax exemption. Those decisions are persuasive only, and we recognize that ██ █ it remains for the determination of the Commission on Hospital Care, subject to review by the Courts, as to whether or not an applicant for a grant is in truth and in fact a nonprofit hospital within the meaning of the Act of Congress and Chapter 430, Laws of 1948. But if it should be held that no hospital corporation in the state which has outstanding capital stock, and the capital assets of which are being enhanced in value by its income being devoted to permanent improvements, can qualify for a grant under Chapter 430, Laws of 1948, then it would be difficult to conceive how the state could use any of the privately owned existing hospital facilities in the state in carrying out its statewide hospital program, since the statute requires that all privately owned hospitals must be nonprofit institutions to be eligible for the grant of state and federal funds. Moreover, Chapter 430, Laws of 1948, presupposes that there may be outstanding stock in the nonprofit hospital, and that there may be earnings by the hospital above its expenses of operation, since the Act defines such a hospital as being one "no part of the net earnings of which inures, or may lawfully inure, to the benefit of any private shareholder, group or individual."

Assuming that the appellee hospital is qualified as a nonprofit institution, as found by the Commission on Hospital Care and by the trial court as an issue of fact, we have left for decision the second ground of defense of whether or not the grant of funds is a donation or gratuity for a sectarian purpose or use in violation of Section 66 of the State Constitution. If there is no "donation or gratuity" involved in the instant case, then Section 66 has no application at all. That is to say, unless there is a donation or gratuity, the problem as to whether or not the grant is "for a sectarian purpose or use" does not arise.

Our Constitution does not say "no appropriation", or "no public funds", or "no money of the state" may be used "for a sectarian purpose or use", but the provision is that no "donation or gratuity" shall be made for such purpose. Nor does our Constitution prohibit a grant being made to any "sectarian institution", as do the constitutions of many other states. Even so, the grant here involved is not to the Sisters of Mercy of Vicksburg, as aforesaid, but to the appellee hospital corporation, engaged in operating a general hospital on a nonsectarian basis. However, money may be handled by a "sectarian institution" and still not be devoted to a "sectarian purpose or use". Administering to the sick is not sectarian; it is done by governmental and secular agencies.

Moreover, the term "donation or gratuity" implies absence of consideration, the transfer of money or other things of value from the owner to another without any consideration. In Bouvier's Law Dictionary, a donation is defined to be the act by which the owner of money or other things voluntarily transfers the title and possession thereof without any consideration in return. Georgia Penitentiary Co. v. Nelms, 65 Ga. 499, 504, 38 Am. Rep. 793; Indiana N. & S. Railway Co. v. City of Attica, 56 Ind. 476, 486; Roche v. Roanoke Classical Seminary, 56 Ind. 198, 202; State ex rel. Western Construction Co. v. Board of Com'rs. of Clinton County, 166

Ind. 162, 76 N. E. 986, 994, citing Bouvier's Law Dictionary; Webster's Dictionary, and Encyclopaedic Dictionary. To the same effect are the cases of Trustees of Rutgers College v. Morgan, 71 N. J. L. 663, 60 A. 205; Chouteau v. City of St. Louis, 331 Mo. 1206, 56 S. W. 2d 1050, and Forsyth v. Reynolds, 15 How. 358, 56 U. S. 358, 14 L. Ed. 729.

Webster defines a gratuity as being: "Given freely, without recompense, or regardless of merit. Not called for by the circumstances; unwarranted. Not involving a return, compensation, or consideration, as in gratuitous contract, one solely for the benefit of one of the parties."

It may be conceded that words are variously defined in both legal and standard dictionaries and elsewhere, but the fact remains that the foregoing definitions are in accord with the common acceptation of the meaning of the term "donation or gratuity". When Section 66 of our Constitution was adopted in 1890, all of the people —Protestants, Catholics, Jews, and those of no religious affiliation at all—met on a common level, through their chosen delegates in the convention, and agreed on the precise limitation which should be placed upon the legislative power in regard to granting funds for a sectarian purpose or use, and they declared that "no law granting a donation or gratuity . . . shall be enacted . . ." for such a purpose or use. It is to be assumed that the words of this brief constitutional provision on such an all-important question were chosen advisedly, and expressed the full measure of the convention's determination and concern in that behalf. It would have been an easy matter to have provided therein that no money of the state should ever be used, or authorized by the Legislature to be expended, for such a purpose or use, but the convention chose to prohibit only a "donation or gratuity" therefor.

In Cooley's Const. Lim. 54 it is said: "The object of construction, as applied to a written constitution is to give effect to the intent of the people when adopting it."

However, this eminent author says that when one is plainly declared in the instrument itself, the courts are not at liberty to search elsewhere for "possible, or even probable, meanings . . ." But the dissenting view in the case at bar is that because the Legislature used the word "grant" in Chapter 430, Laws of 1948, we should substitute the word "donation" as being synonymous therewith. In fact, there is no possible way to make applicable Section 66 of our Constitution to the case before us without giving the word "donation" in this constitutional provision the identical meaning of the word "grant" as used in the said Act of the Legislature. If we should undertake to do this, we are confronted with the difficulty that only one meaning can be ascribed to the word "donation"—a transfer of the property from the owner to another without any consideration in return —whereas a grant is "a method of transferring personal property, distinguished from a gift by being always founded on some consideration or equivalent. 2nd Bl. Comm. 440, 441", and when applied to real estate it is applicable to transfers of such property, whether with or without consideration as hereinbefore shown.

The words "grant and convey" are familiar expressions in deeds executed for a valuable consideration. The substitution of the word "donate" in a conveyance would be generally understood to mean that the conveyance was intended to be without consideration. We are therefore of the opinion that a donation and a grant are not synonymous, as used in our Constitution and the statute in question.

 However, we are relieved of the difficulty in the instant case as to whether the use of the word "grant" in the statute in question was used in the sense of a donation, for the reason that the statute by its plain provisions has clearly disclosed that the so-called "grant" of funds therein mentioned were for valuable considerations in return, and therefore in no sense a donation. But there is an early case from Texas, Fisk v. Flores, decided in

1875 as reported in 43 Tex. 340, where the Court, after recognizing that a donation, as defined by the civil law "is a contract whereby a person gratuitously dispossesses himself of something by transferring it to another, . . .", and that a "donation *inter vivos* is an act by which one gives to another irrevocably and gratuitously some property of which he becomes the immediate owner", proceeds to state that "it is entirely consistent with the nature of a title by 'donation' that the donor may be moved by reason of services rendered (in the past) by the donee to make the donation, and (the fact) that it is induced by such consideration does not take from the transaction the character of a 'donation' ". The point at issue was whether or not the transfer of property under such circumstances from the husband to the wife became a part of the community estate so as to prevent the husband from disposing of the same. We do not think that this decision is controlling on the issue of whether or not the funds allocated by the Commission on Hospital Care to the appellee hospital in consideration of the benefits and services to be received in return, would constitute a donation. The foregoing expression as to what constitutes a donation is not in harmony with the common understanding of the meaning of a donation in either a popular or legal sense. A grant and donation are synonymous only when the former is without consideration, and such is not in our opinion the sense in which the term was used in the statute now under consideration.

A decision of affirmance herein might well rest alone upon the two grounds: (1) that we are not justified in reversing the trial court and the finding of the Commission on Hospital Care on the issue of fact, based on undisputed evidence, that the appellee, Mercy Hospital—Street Memorial, is a nonprofit hospital within the definition of the said Act of Congress and the said statute in question, and (2) that the payment of the funds in question by the Commission on Hospital Care to the said hospital for the considerations contracted for, is not eith-

er a donation or gratuity. However, in view of the fact that the dissenting view to an affirmance of the case is predicated upon three grounds, (1) that the appellee is not a nonprofit hospital, (2) that the granting of the funds applied for by it would amount to a donation, and (3) that the funds are to be used for a sectarian purpose or use, we deem it proper to also state what we deem to be the facts on the question of whether or not the funds are to be used for a sectarian purpose or use, and we do so at the expense of employing the use of *mere dicta* in the completion of this opinion.

For the purpose of stating our views, it may be conceded that the corporation, Sisters of Mercy of Vicksburg, and the appellee, Mercy Hospital—Street Memorial, are both sectarian institutions, and such is the opinion of the three judges who are concurring in this decision, the same as it is of those dissenting hereto, for the reason that the corporate stock of the latter is owned by the former corporation, which is admittedly sectarian. The concurring judges do not concede, however, that the grant is for a sectarian purpose or use, and particularly within the meaning of Section 66 of our Constitution. The operation of a hospital may be for a charitable, benevolent, and philanthropic purpose without being operated for a sectarian purpose.

The appellee, Mercy Hospital—Street Memorial, the incorporators of which were mostly, if not altogether, Protestants, obtained the right under the charter of the Vicksburg Sanitarium to establish only a sanitarium for the treatment of the sick and injured and a school and home for nurses, with no authority expressed therein for teaching any particular religious beliefs, and which hospital was admittedly operated on a nonsectarian basis from 1903 until 1943, and since its incorporation no change has been made in its charter up to the present time so as to enlarge these charter powers—the only changes made since 1903 in the charter being those made in 1935 to prohibit any of the earnings of the hospital

from being paid out as dividends or profit to the share-holders, and the change of the name from Vicksburg Sanitarium to Mercy Hospital—Street Memorial in honor of its Protestant founders.

Even though in 1943 the corporate stock of this hospital, which was chartered 42 years after the charter was granted to the corporation, Sisters of Mercy of Vicksburg, is now owned by the latter corporation, it has been definitely agreed as a part of the contract with the Commission on Hospital Care that the appellee hospital is now operated as a nonsectarian hospital, its bylaws adopted to that effect having been submitted as a part of the application for the fund in question, and as a part thereof, and presumably the contract executed by the appellee Mercy Hospital—Street Memorial with the Commission is to be carried out in good faith.

All matters of policy and the management of the appellee hospital are vested in a Hospital Adminstrative Board, selected *without regard to religious affiliation.* The bylaws of the Mercy Hospital—Street Memorial contain, among other provisions, the following: "Article I, Section 2: This Company shall in all respects be conducted as a non-profit, non-sectarian community service institution. No part of the net earnings of this hospital shall inure to the benefit of any private member, stockholder, group or individual."

Article IX, Section 2, of the bylaws of the hospital, provides: "The Board of Directors shall name a Hospital Administrative Board of ten members who shall elect a chairman from their number.

"The Hospital Administrative Board shall be selected so as to insure that said hospital shall be a community hospital and the members thereof shall be determined *without regard to denomination or creed."* (Italics ours.)

Article III, Section 9, of the bylaws of the appellee hospital expressly requires that the *Board of Directors shall delegate to the Hospital Administrative Board the*

*management and policies of the corporation in the operation of its affairs;* they retain the right to veto the action of said Administrative Board only in the matter of the "disposal, pledging, or hypothecation" of any of the property or funds of the hospital.

The Board of Directors, which is composed of not less than five of the corporate members of "The Sisters of Mercy of Vicksburg" name three members of the Hospital Administrative Board, who may be Sisters, but who are not required to be. The medical staff of the appellee hospital, composed of twenty-one doctors who at this time happen to all be members of the Protestant faith, name three members of the Hospital Administrative Board, who may be, but are not required to be, physicians. The six members of said Board so named get together and name three lay people of any religious denomination to make out the nine members of the Board, who name another person as chairman thereof. It so happens that at the present time the Hospital Administrative Board is composed of five Catholics and five Protestants. Vicksburg is a Catholic center in this state. The appellee Mercy Hospital—Street Memorial, is open to the public of all races, creeds and faiths as well as to those who profess no religious belief. Religion is not taught in the hospital nor are there any Bibles, or other religious books or literature distributed therein. Crucifixes are in the hospital rooms, but since a crucifix is a cross bearing an effigy of Christ crucified—a Christian emblem—its use is not confined to one church alone. Its presence could neither cause a Protestant or Jew to embrace the Catholic faith, nor could its absence cause a Catholic to relinquish his beliefs in favor of the Protestant or Jewish religion. No patient would likely stay so long.

Each minister of the Gospel in Vicksburg, whether Protestant, Catholic, or Jew, is notified daily by the hospital authorities of the arrival of any patient of his

particular faith, and a welcome is extended for them to visit those patients if they are physically able to receive visitors.

The business manager of the hospital belongs to the Christian Church. Graduate and student nurses are accepted without regard to religious affiliation. Out of the number of approximately 75 students and graduate nurses (most of whom are Protestants and required to attend their own church at least once a month) only two or three of the nurses are Sisters, wearing uniforms of the Sisterhood. There are only eight Sister nurses in all at the hospital, one of whom is an administrator of the hospital, another of whom has charge of the dietary and food services, and the third of whom is in charge of the hospital's bookkeeping department. These eight Sisters receive for their services only the total sum of $1,500 per month for the eight of them, a sum barely sufficient to meet their actual necessities, although the three executives specifically mentioned above are filling positions which would ordinarily command a salary of from $5,000 to $8,000 per annum.

The conduct of the hospital does not differ in any respect from that of any other general hospital of comparable size and similarly located for carrying on the work of administering to the sick.

No part of the physical properties or other assets of the hospital corporation has been accumulated by the contribution of any funds from the Catholic Church or any other church, or from the Sisters of Mercy of Vicksburg; nor do any of the earnings of the hospital go into the treasury of the Catholic Church or any other church, or into the treasury of the Sisters of Mercy of Vicksburg, Incorporated. It should be kept in mind that the corporation, Sisters of Mercy of Vicksburg, is not a party to this suit, and has neither applied for nor been granted any funds by the Commission on Hospital Care.

Section 86 of the Mississippi Constitution of 1890 contemplates, among other things, that "the legislature

may provide for the care of the indigent sick in the hospitals in the state.'' If this obligation of the Legislature, though not a mandatory duty, is to be discharged, it must be done through some agency equipped to render such service, and this constitutional provision contemplates that it may be done in the hospitals *in* (not necessarily of) the state. The federal appropriation in which all states may share has brought about a situation where it has become a duty and a public function that the Legislature shall provide for the care of the indigent sick in justice to them, and secondarily in recognition of our state's right to share in the federal funds.

If there be apprehension that when the charter of the Mercy Hospital—Street Memorial shall expire on April 13, 1953, the owners of the corporate stock therein may fail to have the charter renewed and allow it to lapse so that upon dissolution the stockholders may claim the capital assets, including the new building and equipment, as their own, or for the Catholic Church, notwithstanding that the assets belong to the Corporation, Sisters of Mercy, to which the stock was sold by the Drs. Street, and also claim the right to operate the hospital, or dispose of the same, in disregard of the contractual agreement of the Mercy Hospital—Street Memorial with the Commission, and that they will assert their right to do so as individual shareholders, or that the Sisters of Mercy, Incorporated, will undertake to do so, freed of any obligation to carry out the solemn contract with the state to render the services hereinbefore mentioned, such apprehension may be dispelled by the fact that under the contract with the Commission, and Chapter 430, Laws of 1948, a lien would immediately attach in favor of the state for the funds advanced under this grant, for failure to continue to operate the hospital as a nonprofit institution for 20 years and render the services to the state as contemplated.

Moreover, such a scheme to obtain the grant with the purpose of breaching the contract and getting a new

hospital for private gain at great expense to the state and federal government, to claim as their own by repudiating the bylaws hereinbefore quoted, and which were submitted as part of the hospital's application to the Commission on Hospital Care, would amount to a monumental fraud upon the Commission and the state and federal governments, such as is not to be presumed. On the contrary, good faith is to be presumed, and not fraud. Any fear that the present members of the Sisters of Mercy, or their successors, as owners of the corporate stock would do otherwise than operate the hospital for the next 20 years as a nonprofit institution and render the services to the state as contracted for, and without regard to religious affiliations, race or creed of the patients, would be inconsistent with the honorable record of sacrificial service rendered by them to the sick in the past, without the slightest taint or suspicion of greed and avarice.

As to what may happen beyond the 20 years' period of service contracted for, it is contemplated that a long-range hospital program for such a period will enable the state to get value received in the performance of a service by the hospital to the indigent sick and from the other benefits contracted for, in fulfillment of the state's constitutional authority and governmental function; and that this will furnish a valuable consideration in return for the grant and prevent it from being a donation or gratuity.

In 59 C. J. Section 342, p. 203, the general law is stated: "A constitutional limitation, express or implied, on gifts of public money does not generally apply to a disbursement, appropriation, or other fiscal statute for a public purpose to carry out a function of the government or to discharge the obligation of the state, although only a moral or equitable obligation."

In Craig, State Auditor v. North Mississippi Community Hospital, 206 Miss. 11, 39 So. (2d) 523, 528,

this Court said: "The law (Chapter 430, Laws 1948) now under attack is clearly a statute which does bear a reasonable relation to a governmental purpose as expressed in Section 86 of the Mississippi Constitution of 1890." And the Court further said: "If the end be public, it matters not that it is attained through a private channel", provided, of course, that as in the case at bar the grant is not a "donation or gratuity" for a "sectarian purpose or use".

In its petition for mandamus the North Mississippi Community Hospital described itself as a "non-profit, nonsectarian corporation", which was admitted by the demurrer.

The Court, following the petitioner's own description of itself in that case, held that "the legislature has the authority to appropriate public funds out of the state treasury for the care of the indigent sick in the nonprofit, nonsectarian hospitals in this state in accordance with the above quoted Section 86 of the Constitution, particularly where the expenditure of such funds for such purposes is under the supervision and control of a state agency." In other words, the decision was limited to the case then before the Court wherein it was admitted that the hospital involved in that case was nonprofit, and nonsectarian. There was no attempt to infer what the future might hold for any other hospital. No sectarian problem was there involved, since the institution was admitted to be nonsectarian, and the question of whether or not the grant in that case was a "donation or gratuity" for a "sectarian purpose or use" under Section 66 of the Constitution did not arise for the consideration and decision of the court in that case, it being admitted by the demurrer that the grant of funds was not for a sectarian purpose or use, as hereinbefore stated.

It is of interest, however, that in the recent case of Bedford County Hospital v. Browning, 225 S. W. (2d)

41, 43, decided on December 17, 1949, though not involving an alleged sectarian purpose, the Supreme Court of Tennessee held, in regard to a *grant* to be supplemented by such federal funds in aid of a hospital, that: ''This grant does not constitute a gratuity or donation of State credit, as under the terms of the Act itself this constitutes a performance of public duties and with no right to reap individual profit.'' In other words, the Court did not think a ''grant'' or funds under a state statute and the Act of Congress supplementing the same as in the instant case, was the same as a ''donation or gratuity'' of state credit. We cite this case only on the point that a grant is not necessarily a donation or gratuity. The Tennessee statute called the state's contribution of funds to its hospital program a ''grant'', but the Court held that such was not a gratuity or donation.

Also, on May 20, 1949, the Supreme Court of Kentucky, in the case of Kentucky Building Commission v. Effron, 310 Ky. 355, 220 S. W. (2d) 836, 838, when construing Section 5 of their Constitution which provides that, ''No preference shall ever be given by law to any religious sect, society or denomination; nor to any particular creed, mode of worship or system of ecclesiastical polity'', and where one of the hospitals was controlled and governed by Episcopalians and the other by Catholics, held as follows: ''It is well settled that a private agency may be utilized as the pipeline through which a public expenditure is made, the test being not who receives the money, *but the character or the use for which it is expended.* 51 Am. Jur., Section 390, p. 381; Hager v. Kentucky Children's Home Society, 119 Ky. 235, 83 S. W. 605, 67 L. R. A. 815; Orphan Society of Lexington v. Fayette County, 6 Bush 413, 69 Ky. 413; Robinson v. Mercer Fiscal Court, 218 Ky. 452, 291 S. W. 721.'' (Italics ours.)

In this Kentucky case there was involved a grant to certain hospitals, and one of them, ''Our Lady of Peace'',

was controlled and governed by a board whose members were of the Catholic faith, and the court further said: "But the hospitals are open to the public of all creeds and faiths—and even to those who profess no certain religious belief. Religion is not taught in these hospitals nor is any one sect given preference over another. The fact that members of the governing boards of these hospitals, which perform a recognized public service to all people regardless of faith or creed, are all of one religious faith does not signify that the money allotted the hospitals is to aid their particular denomination. On the contrary, the governing boards of such hospitals are but the channels through which the funds flow. Courts will look at the use to which these funds are put rather than the conduits through which they run. If that use is a public one and is calculated to aid all people in the State, it will not be held in contravention of Section 5 merely because the hospitals carry the name or are governed by the members of a particular faith. 51 Am. Jur., Section 349, p. 393."

Now, referring to the cases relied upon by the Attorney General in the case at bar, the purport of which may seem to be in conflict with what has been above stated, it will be found that the section of the state constitution involved in the case of State ex rel. Nevada Orphan Asylum v. Hallock, 16 Nev. 373, reads as follows: "No public funds of any kind or character whatever, state, county, or municipal, shall be used for sectarian purposes", article 11, Section 10, whereas Section 66 of our Constitution provides that: "No law granting a donation or gratuity . . . shall be enacted . . . for a sectarian purpose or use." The two provisions are vastly different. Nevada says "No public funds of any kind or character . . ., shall be used for sectarian purposes", whereas Mississippi says no "donation or gratuity" shall be made for such a purpose. Our Constitution leaves the Legislature free to make a grant for a valuable consideration in return, whereas Nevada pre-

vents such a grant without regard to what may be received in return.

The provision of the Constitution of South Dakota, article 6, Section 3, involved in the case of Synod of Dakota v. State, 2 S. D. 366, 50 N. W. 632, 633, 14 L. R. A. 418, reads: "No money or property of the state shall be given or appropriated for the benefit of any sectarian or religious society or institution," whereas Mississippi only forbids a donation or a gratuity for such purpose. In the South Dakota case the institution to which the appropriation was made was chartered and organized "to maintain and promulgate the doctrines and belief of the Christian religion, and of the sect known as 'Presbyterians.' " The grant was held to be in violation of the constitution on the ground that the State is not only prohibited from giving or donating said funds, but from appropriating them at all. The decision hung on the words "or appropriated". No donation was claimed, a consideration in return was involved, but the Court said that under the above constitutional provision "the state is not only prohibited from giving or donating state funds, but from appropriating them."

The provision of the Georgia Constitution 1877, art. 1, Section 1, par. 14, involved in Bennett v. LaGrange, 153 Ga. 428, 112 S. E. 482, 22 A. L. R. 1312, reads: "No money shall ever be taken from the public Treasury directly or indirectly, in aid of any church, sect, or . . . religionists, or of any sectarian institution". In other words, Georgia says "No money shall ever be taken from the public Treasury . . . in aid of . . . any church, . . . or of any sectarian institution", whereas Mississippi says no "donation or gratuity" shall be made for a sectarian purpose or use. Therefore, in the Georgia case a contract with the Salvation Army, a sectarian institution, to care for the poor of the City of LaGrange, violated the constitution; that is to say, the fact that the city received a consideration, or whether

there was a donation or gratuity involved, was immaterial. The money may have been "in aid of" the Salvation Army, although clearly not a donation, and therefore in violation of the very terms of the foregoing constitutional provisions of Georgia, as the Court held. A bank may render great aid to an individual or corporation by a loan of money, but it is not, or at least not intended as, a donation.

The LaGrange case was followed in Richter v. City of Savannah, 160 Ga. 178, 127 S. E. 739, and the same distinctions were applicable, with the addition that the hospital was operated under a rule and regulation providing: "This institution is incorporated and owned by the Sisters of Mercy, and it is intended to be operated from the standpoint of a religious order." The very opposite facts exist in the present case, where the by-laws of the Mercy Hospital—Street Memorial expressly declare: "Article I. Sec. 2: This company shall in all respects be conducted as a non-profit, non-sectarian community service institution."

The provision of the Illinois Constitution before the Court in Cook County v. Chicago Industrial School, 125 Ill. 540, 18 N. E. 183, 197, 1 L. R. A. 437, 8 Am. St. Rep. 386, reads: "Neither the general assembly . . . or other public corporation, shall ever make any appropriation or pay from any public fund whatever, anything in aid of any church or sectarian purpose . . .; nor shall any grant or donation of land, money, or other personal property ever be made by the state or any such public corporation, to any church, or for any sectarian purpose." Smith-Hurd Stats. Const. art. 8, Section 3.

The difference between this provision and Section 66 of our Constitution will be readily seen. In that case there was public money paid to a sectarian institution for a consideration, the tuition and maintenance of indigent girls, and the Court could not have found that the appropriation was in violation of the latter part of

such constitutional provision, for the reason that it was not a "donation or gratuity". But the Court did necessarily find that the language of the first portion of said constitutional provision was violated, even though the money paid was for services rendered, and, therefore, not a donation. This was because "any appropriations" in aid of any church or sectarian purpose, whether for a consideration in return or not, is thereby prohibited. The Court there said: "The constitution declares against the use of public funds to aid sectarian schools, independently of the question whether there is or is not a consideration furnished in return for the funds so used". Ours declares against a donation or gratuity only, and therefore is inapplicable otherwise.

But the strongest case relied upon by the Attorney General is that of Collins v. Kephart, State Treasurer, et al., 271 Pa. 428, 117 A. 440, 442, which involved a provision in the Constitution of Pennsylvania, which reads: "No *appropriations,* except for pensions or gratuities for military services, shall be made for charitable, educational or benevolent purposes, to any person or community, nor *to* any denominational or sectarian institution, corporation or association". P. S. Const. art. 3, Section 18. (Italics ours.) While the principles announced by the Court in that case, and the strong argument for the complete separation of church and state, are very persuasive as to the intent of such constitutional provisions, as forbidding the state from giving any recognition, even in the fields of public charity and education, we are of the opinion that since the Pennsylvania Court in writing its opinion had before it five suits in equity to restrain the payment of moneys appropriated directly to denominational sectarian institutions, in each instance, without requiring any consideration in return (which would be material and controlling in the present case under all the facts), the decision turned on the point set forth by the Court in its opinion when it said: "It will be noted the Constitution does not say

merely that no appropriation shall be made for sectarian or denominational purposes, nor does it confine the limitation against state aid to these institutions which actually teach sectarian doctrines or promote denominational interest. What it provides is that 'no *appropriation* shall be made to any denominational or sectarian institution.' (Italics ours.) These words, when taken at their face value, are most comprehensive in scope.''

Pennsylvania would not look to the purpose or use to which state aid was put, but only to the nature of the institution. The state was prohibited from using a sectarian institution as a medium for the performance of governmental duty. ██ ██ In Mississippi, such is not the case. Moreover, it is not shown that the Mercy Hospital—Street Memorial, although a sectarian institution in that its corporate stock is owned by a sectarian corporation intends to use the funds in question for a sectarian purpose or use. The new hospital is to be devoted to the work of administering to the sick—a nonsectarian purpose or use,—the same as it was before its sale to the Sisters of Mercy in 1943 so far as its operation without regard to religious affiliation is concerned; that is to say it is to operate under the same charter powers and for the same purposes authorized by the charter of the Vicksburg Sanitarium granted in 1903 to its Protestant incorporators, as vouchsafed by the bylaws made a part of the application for the funds in question.

We do not contend that the foregoing decisions relied on by the appellant, State Auditor, are not controlling here merely because the constitutional provision involved in each of them was not couched in the same language as Section 66 of our Constitution, but because in our opinion the constitutional provisions under consideration in those cases are different in substance from our Constitutional provision here under consideration.

The case of Bradfield v. Roberts, 175 U. S. 291, 20 S. Ct. 121, 44 L. Ed. 168, is decisive of the question of

whether or not a hospital chartered to care for the sick, as the limited object of its creation as in the case of Mercy Hospital—Street Memorial, could receive a grant of aid from the federal government under a contract between the District of Columbia and the directors of the hospital, composed of a monastic order or sisterhood of the Catholic Church, without there being a violation of Article 1 of the Amendments of the Federal Constitution providing that "Congress shall make no law respecting an establishment of religion, . . . ." And the facts there involved make applicable the principles there announced so as to make the grant, in the case now before us, a valid one. This case is cited to show that the doctrine of the separation of church and state is not violated, and also as authority for the proposition that the charter powers of a corporation control, and not the religious beliefs of its stockholders, as to whether it is operated in a secular activity.

It is contended by the appellant that this Court "has already adjudicated the petitioner to be a religious society and pointed out its sectarian nature in the case of Maas v. Sisters of Mercy of Vicksburg et al., 135 Miss. 505, 99 So. 468, but we do not find that the petitioner, for the writ of mandamus in the instant case to whom the grant of state and federal funds is sought to be made, to wit, Mercy Hospital—Street Memorial, with such provisions of its bylaws as are made a part of its contract with the Commission on Hospital Care now before us, was in any manner involved in that suit. Ordinarily the character of the appellee hospital in the instant case would be determined by its own rights and powers under its charter as a separate and distinct corporation from that of Sisters of Mercy of Vicksburg, which was incorporated 42 years prior to the granting of the charter of the appellee hospital, embodying no sectarian purpose among its charter powers granted to Protestant incorporators.

While not in point on its facts, but only on what this Court has held as to the meaning of the separation of church and state, it will be found that in the case of Chance v. Mississippi Textbook Board, 190 Miss. 453, 200 So. 706, involving the lending of free textbooks to pupils in parochial schools, this Court took high ground on the contentions there made as to what is meant by *the separation of church and state,* ground from which we should not now retreat.

We think that the finding of the Commission on Hospital Care and of the Circuit Court that the hospital is a nonprofit institution, and that the grant in question is not a donation or gratuity at all, is amply supported by the oral and documentary evidence in the case, and that therefore the judgment appealed from should be affirmed.

Since preparing the original draft of this opinion, we have carefully examined the cases relied upon in the dissenting opinion, and have reexamined the cases relied upon in the briefs of counsel hereinbefore discussed, and we do not feel justified in giving them any different construction and application than that hereinbefore set forth.

The writer would not attempt to justify an opinion of such great length as this one, but will say in mitigation that he has been prompted to write at such length because of the great importance of the issues involved, and the status of many other applicants for grants from these funds may be affected hereby.

Affirmed.

**Roberds, J.** (concurring).

I place my concurrence in the majority opinion primarily on the ground that this is not a donation or a gratuity. This hospital is to have one hundred and seventy-five wards. The hospital contracts to use and

maintain ten per cent of such wards for charity patients for twenty years. The value of seventeen wards operated for charity patients for that time, figured at the lowest justifiable rate, would amount to twice as much as the State is contributing to the operation of the hospital, placing no value whatever on the obligation of the hospital to make available and use its facilities for medical and technician training for doctors and nurses. If the hospital does not carry out its contract, the State, under the contract and the statute, has a right to have imposed upon the hospital assets a lien to enforce its contractual rights.

**Hall, J.** (dissenting).

Risking an accusation of intolerance and bigotry, I am impelled to dissent from the controlling opinion in this case. There are six hospitals in this state owned and operated by religious denominations, three Protestant and three Catholic. No doubt they are all interested in obtaining grants for the expansion and improvement of their facilities, and no doubt it is purely accidental that the first of these institutions making an application and bringing a test suit happens to be the appellee in this case. I would much prefer that the applicant be the Baptist Hospital, to which faith I adhere, so that my views of the questions before us would not be misinterpreted. I approach the matter with a full realization of the great humanitarian work being done by these denominational hospitals to all patients regardless of faith or creed, and nothing herein is intended to disparage the usefulness of these institutions nor the sincerity and unselfishness of those who have dedicated their lives to such altruistic purposes. If the appellee here were the Mississippi Baptist Hospitals, my views would be the same.

This country was discovered and populated by persons of many creeds and faiths, including primarily

Catholic, Protestant and Jewish. They united in the common cause of wresting our independence from British rule and after a Divine Power had crowned their efforts with success they banded themselves together in the formation of our system of government as expressed in the Constitution of the United States, and, with the experience of the ages as their guide, they provided therein that Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. Thus there was erected a new nation, one of whose pillars rested upon the wise principle of the complete separation of church and state, under which all sects have grown and prospered both materially and spiritually under a cloak of toleration. Religious freedom has become just as firmly embedded into our way of life under this government as have the principles of freedom of speech, freedom of the press, the right of peaceable assembly and the right of security against unreasonable searches and seizures. This religious liberty is no idle catch-word, but guarantees to even such organizations as Jehovah's Witnesses the right to their beliefs, and we extend tolerance to them even though we may sometimes question their judgment with respect to some of their precepts. I do not subscribe to the thought as expressed in one of the briefs before us that the separation of church and state is a mere slogan and that it may be carelessly compounded into a viciously dogmatic instrument of ignorance and bigotry, so encrusted by long use as to be impervious to reason. On the contrary, in my feeble judgment it is a very vital part of the solid foundation of true democracy, so much so that the framers of our Mississippi Constitution, by Section 18, provided that "no religious test as a qualification for office shall be required; and no preference shall be given by law to any religious sect or mode of worship; but the free enjoyment of all religious sentiments and the different modes of worship shall be held sacred."

Without intending in any manner to impugn the high motives of those concerned, let us examine the legal status of the appellee corporation. It was originally a corporation organized for profit with $50,000 outstanding capital stock. By an amendment to the charter of incorporation on October 21, 1935, it was declared to be a nonprofit corporation pursuant to the provisions of Section 4131 of the Mississippi Code of 1930, which is the same as Section 5310 of the 1942 Code. The applicable portion of that section provides that charitable associations may be incorporated upon the application of any three members authorized by the organization of its minutes to apply for the charter. It then provides "Such corporations . . . shall issue no shares of stock, shall divide no dividends or profits among their members", etc. The appellee was expressly prohibited by this section of our law which authorized its creation from issuing any shares of stock, and if it issued such shares it did not come under the provisions respecting nonprofit corporations. After the charter amendment in 1935 the stockholders continued to hold their $50,000 stock certificates, and on July 7, 1943, those stockholders made an outright sale of their shares of stock to Sisters of Mercy of Vicksburg, another Mississippi corporation, and the stock was transferred to and reissued in the name of the latter corporation which now continues to hold the same. There was no separate sale or transfer of the physical assets of the hospital but merely a sale of its capital stock to the Sisters of Mercy. Since the appellee has outstanding capital stock issued to the Sisters of Mercy, it does not qualify under the laws of this state as a nonprofit hospital, regardless of the amount of humanitarian and charitable work which it is doing. The record shows that its surplus has increased from $354,191.85 on January 1, 1946, to $518,180.60 on December 31, 1949, but its exact net worth is not shown. Appellee's charter was issued April 13, 1903, and by the terms of the charter

it will expire on April 13, 1953, which is approximately three years from now. The question naturally presents itself: How can the appellee effectually guarantee to operate a hospital, maintaining 10% of its bed capacity for charity patients, for a minimum period of twenty years, when its charter will expire and it will in legal effect be out of existence in three years?

But the more serious question presents itself: What will be the status of the property of appellee upon the termination of its charter in 1953? In the case of Woodville Lodge v. Poole, 190 Miss. 798, 1 So. (2d) 780, this court held that upon termination of a nonstock corporation its assets are vested in the surviving members. It is well established that upon termination of a stock corporation, its assets are vested in the stockholders. So in either case here the result is the same because the members of the appellee corporation are one and the same as the members of the Sisters of Mercy Corporation, in whose name appellee's outstanding capital stock is held. The title to all of appellee's property will therefore become vested in the Sisters of Mercy whose status as a religious society will be discussed later herein.

I am unable to bring myself into agreement with the assertion in the controlling opinion that appellee is a private hospital as distinguished from a sectarian hospital. The record here shows that its hospital is decorated with religious property and that there is a crucifix on display in every room, including those rooms to which charity patients are and will be admitted; the crucifix is generally recognized in this state as an emblem of the Roman Catholic Church and as a symbol of its faith. I have never heard of its use by any other church in this state or section. Every member of appellee's board of directors is and at all times must be a member of the Sisters of Mercy. Much emphasis is laid upon the fact that on October 8, 1949, these directors adopted bylaws whereby the general policy of the hospital was placed

in an administrative board, as set out in the controlling opinion. The Sisters of Mercy had owned appellee's stock for more than six years before these bylaws were adopted and the new administrative board, created by the bylaws, was set up nearly four months after the filing of appellee's application for $741,000 of public funds and just two days before approval of the application. These very same bylaws provide that they may be repealed or amended at any time by a majority vote of the stockholders; this fact is pointed out merely to show the legal status of the organization and without any intention whatsoever of imputing bad faith to the appellee's directors. It is provided that the corporate members of the Sisters of Mercy shall constitute the stockholders and members of the Mercy Hospital—Street Memorial, "each stockholder having an equal vote and interest", and that it shall be managed by a board of five directors who shall be corporate members of the Sisters of Mercy. The charter of incorporation of the Sisters of Mercy authorizes it, among other things, "to establish and maintain and own in Vicksburg and Warren County, and in the other cities and counties throughout the State of Mississippi, when deemed advisable by it, under the auspices of the Bishop or Bishops of the Catholic Diocese of Mississippi, infirmaries for sick people." Webster defines "auspices" as "protection, patronage and care, guidance." The same authority defines "guidance", among other things, as "the superintendence of a guide, direction, government." There is no substantial difference between this charter and that of the Mississippi Baptist Hospital which has as its members a board of trustees, elected by, and serving under the auspices and control of the Mississippi Baptist State Convention.

The record in this case shows that there has been no material change in the status of the Sisters of Mercy since the decision of this court in the case of Maas v.

Sisters of Mercy of Vicksburg, 135 Miss. 505, 99 So. 468, 469. In that case this court said:

"The Sisters of Mercy of the Catholic Church is an organization through which the Catholic Church carries on a large part of its religious, charitable, and educational work. It is a monastic sisterhood, established in Ireland by Catherine McAuley in 1827. Notwithstanding its origin is comparatively recent, the society has extended its charitable, religious, and educational work over a large part of the earth. The members of this sisterhood, as shown by the evidence in this case, are governed by the constitution, laws, and usages as laid down in the following authorities, which were properly identified at the trial and introduced in evidence: Volume 10, Catholic Encyclopedia, pages 199 to 200; Rules and Constitutions of the Religious Sisters of Mercy, published by the Baltimore Publishing Company, containing 78 pages; Religious Profession, a commentary on a chapter of the new code of canon law by Hector Papi, S. J., Professor of Canon Law, Woodstock College, published by P. J. Kennedy & Sons, New York, containing 81 pages; Catechism of the New Religious Provision, translated from the French, and revised in conformity with the new code.

"It will be observed from the constitution and bylaws of the society that, after a given course of service and training preparatory thereto, the Sisters of Mercy take vows of poverty and obedience.

. . . . . .

"By the vow of poverty the Sisters of Mercy in substance bind themselves to be entirely disengaged from the love of the things of this world; that they will be 'content with the food and raiment allowed them, and willing at all times to give up whatever has been allotted to them; that they will not give or receive any present without permission from the Mother Superior, and when, with her permission, they receive any present from their relatives or other persons, it must be considered as for

the use of the community and not for the particular use of the receiver. By the vow of obedience they forever renounce their own will and bind themselves to become resigned to and follow the direction of their superiors. The vow concludes with the language that 'they shall obey the call of the bell as the voice of God.'

"The 'Catechism of the Religious Profession' defines what the oath of poverty means. In substance it is that it effectually deprives the members of the society of all right to own property in their individual capacity, and places them in a state of material subjection and dependence to their superiors; that any property owned by a sister at the time of profession, as well as any property she may thereafter acquire by legacy, inheritance, conveyance, or otherwise, shall inure to the benefit of the society; that the Sisters of Mercy receiving property shall be deprived of the 'use and usufruct of such property as well as of the free and independent disposal thereof; that even the bare legal title cannot be disposed of by the holder thereof without the permission of the governing authorities; that all property owned or acquired by the members of the society shall be community property, that is, the use thereof shall go alone for the benefit of the society; that a Sister shall depend alone on the food, raiment, and support furnished her by the society, which shall be the same as furnished to every member thereof. No member of the society shall have any right to or claim under any circumstances more than her support for the time she is a member. See pages 55, 56, 58, 59, 60, 64, 70, 71, 76, 78, 79, 110. Withdrawal or dismissal from the society is permitted with the approval of the Pope. When withdrawal or dismissal takes place all the property acquired by the Sister during her membership belongs to the society; she takes none of it with her.

· · · · · ·

"Clearly the constitution, bylaws, and usages of the Sisters of Mercy constitute, so far as they deal with their

civil rights, a binding contract between them, provided, of course, the Constitution and laws of the state are not violated. So far as the ownership of property is concerned, the members of the society are simply trustees for the benefit of the society."

In the opinion on suggestion of error in the Maas case, the court elaborated further upon what was shown in the record and said: "In the article referred to in the Catholic Encyclopedia it is stated that, after the organization of the society of Sisters of Mercy, a question arose as to whether it should be a religious society, and that a vote was taken and the society unanimously decided to become a religious society. . . . In said book, Rules and Constitutions of the Religious Sisters of Mercy, second part, chapter 1, we find the following: 'This religious congregation shall be always subject to the authority and jurisdiction of the Diocesan Bishop, and the Sisters shall respect and obey him as their principal superior after the Holy See.'"

Based on these undisputed findings this court held that a devise to members of the Sisters of Mercy, in their individual capacity, was, in effect, a devise to the society and void under our Mortmain Statutes as they existed at the time of the Maas decision because there was a resulting trust in favor of the society "by means of which, if enforced, the Mortmain Statutes would be completely circumvented." The conclusion of the court was that the devise was void for this reason.

I have reviewed at length this history of the Sisters of Mercy for the reason that the controlling opinion states that the nature and character of the appellee hospital in this case is to be determined by its own rights and powers under its charter as a separate and distinct corporation from that of the Sisters of Mercy. The controlling opinion says "No part of the physical properties or other assets of the hospital corporation has been accumulated by the contribution of any funds from the Catholic

Church or any other church, or from the Sisters of Mercy of Vicksburg.'' With due deference, the record shows without dispute that the Sisters of Mercy paid $50,000 for the corporate stock in the appellee corporation; I quote from the testimony of appellee's own witness shown on page 84 of the record: "Q. In 1943 what did the Sisters of Mercy pay for this stock? A. They paid $50,000.00. Q. For the 500 shares of stock? A. That is correct.''

Again, with due deference, I have searched the record in vain to find anything in the contract to support the statement in the controlling opinion ''. . . it has been definitely agreed as a part of the contract with the Commission on Hospital Care that the appellee hospital is now operated as a nonsectarian hospital.'' If it is in the contract I am unable to find it. Two days before approval of the grant by the commission the appellee did adopt some bylaws and did file them with the commission, but, as elsewhere pointed out herein, these bylaws specifically provide in the very last article thereof ''These by-laws may be amended, repealed or alerted in whole or in part by a majority vote of the entire outstanding stock of the company at any regular meeting of the stockholders or at any special meeting where such action has been announced in the call and notice of such meeting.'' Thus the commission and all who may examine its files were put on notice that the Sisters of Mercy (for they compose all the stockholders) reserve the right to change the bylaws at any time.

Reviewing the record as to the rights and powers of appellee, briefly summarized, it is this: All its stock is owned by Sisters of Mercy; all its corporate members are and shall always be members of that society; all its board of directors are and shall always be selected from the members of the Sisters of Mercy; these members are always subject to the authority and jurisdiction of the Diocesan Bishop; they can own

no property themselves and all the material belongings in their possession are held by them as trustees for the society which is under the control of the Bishop of the Roman Catholic Church. The Church, therefore, has absolute dominion and control over the appellee and all its property, and this fact is not altered simply because there are presently existing bylaws, which are subject to change at any time, whereby the present general management of the hospital is vested in an administrative board. As stated in the Maas case, the question arose long ago as to whether the Sisters of Mercy should be a religious society and ''a vote was taken and the society unanimously decided to become a religious society.'' These are the undisputed facts reflected by the record before us, and while a majority of the court has determined that the appellee is in fact a sectarian institution, the controlling opinion nevertheless proceeds with the recital of facts and citation of authorities in an apparent effort to show that it is not such, and its whole conclusion is based upon the bylaws which were adopted just two days before the approval of the application for this grant of public funds and which specifically reserve the right to change or repeal the bylaws at any time. Nor can I see any alteration of my conclusions in the fact that the medical staff of the hospital, that is, the physicians and surgeons who are authorized to attend their patients in the hospital, are members of the Protestant faith; this staff has nothing to do with the ownership or management of the hospital. I can see no escape from the conclusion under the facts before us that appellee is a sectarian institution, and that it is utterly impossible to separate it from the Sisters of Mercy, as is done in the controlling opinion, merely because it is a separate corporate entity. Appellee's stock is now owned outright by Sisters of Mercy and when its charter expires in 1953 everything that it owns will by operation of law become vested in Sisters of Mercy.

The Nevada Constitution, article 11, Section 10, provides that "No public funds of any kind or character whatever, state, county, or municipal, shall be used for sectarian purposes." In the case of State ex rel. Nevada Orphan Asylum v. Hallock, 16 Nev. 373, the court was confronted with the question as to what was meant by "sectarian purposes" and the court held that the Nevada Orphan Asylum, operated by the Sisters of Charity at Virginia City, was a sectarian institution regardless of the fact that children of all faiths and creeds were admitted to it, and that an appropriation of public funds for its support was in violation of the constitution of that state. The court in that case said: "A religious sect is a body or number of persons united in tenets, but constituting a distinct organization or party, by holding sentiments or doctrines different from those of other sects or people. In the sense intended in the constitution, every sect of that character is sectarian, and all members thereof are sectarians. The framers of the constitution undoubtedly considered the Roman Catholic a sectarian church. Const. Debates, 568 et seq. The people understood it in the same sense when they ratified it." Responding to the contention that there was a consideration for the appropriation in that the funds would be used for the support of orphans, charges of the state, irrespective of religious belief, the Nevada court said: "The $75.00 appropriated for each orphan is a contribution only. Should it be given it would be used for the relief and support of a sectarian institution, and in part, at least, for sectarian purposes. Should it be admitted that it would be used in part for legitimate purposes, still, it is impossible to separate the legitimate use from that which is forbidden."

In the case of Bennett v. City of LaGrange, 153 Ga. 428, 112 S. E. 482, 486, 22 A. L. R. 1312, there was under review a contract between the city and the Salvation Army whereby the latter had contracted to handle chari-

table cases for the city for the actual costs of such services not to exceed $75 per month and the question presented was whether this contract was in violation of a provision in the Constitution of Georgia that ''No money shall ever be taken from the public Treasury, directly or indirectly, in aid of any church, sect, or denomination of religionists, or of any sectarian institution.'' Article 1, Section 1, par. 14. The Supreme Court of Georgia held that even though the Salvation Army was not denominational, yet, because it conducted meetings at which the tenets of the Christian faith were advocated, it was sectarian in character notwithstanding the high principles upon which it is founded and the great work which it is doing. It is in point here to note that the court said that the contract gave 'a great advantage and the most substantial aid to the Salvation Army in the prosecution of its benevolent and religious purposes. The giving of loaves and fishes is a powerful instrumentality in the successful prosecution of the work of a sectarian institution.''

It is also worthy of note at this point that in the annotation following the report of the above case, in 22 A. L. R. at page 1319, it is said: ''The weight of authority is to the effect that a contract between a state, county, city or other political subdivision and a sectarian institution, whereby the former agress to pay the latter for services rendered or expenditures incurred thereunder, is within the meaning of a constitutional provision inhibiting the use of public funds in aid of sectarian institutions, and void.''

A similar question was again before the Georgia Supreme Court in the case of Richter v. Mayor & Aldermen of the City of Savannah, 160 Ga. 178, 127 S. E. 739, when the City of Savannah was prohibited from making an appropriation for the support of St. Joseph's Hospital, owned and operated by the Savannah Institute Sisters of Mercy, a corporation. In that case the court said that the Sisters of Mercy and the hospital are sectarian insti-

tutions, and followed the principles announced in Bennett v. City of LaGrange, supra.

In the case of Collins v. Kephart, 271 Pa. 428, 117 A. 440, there was involved the question whether grants of public funds to four different hospitals were in violation of a provision of the Pennsylvania Constitution which provides ''No appropriation . . . shall be made for charitable, educational or benevolent purposes to . . . any denominational or sectarian institution, corporation or association.'' P. S. Const. art. 3, Section 18. One of these was Passavant Hospital of Pittsburgh, owned by a corporation whose charter provided that the persons composing the society are members of the Evangelical Lutheran Church and that the directors, though two might be laymen, must be members of said church in good and regular standing. Another of the hospitals under consideration was St. Timothy's Memorial Hospital and House of Mercy, a corporation composed of members of the Protestant Episcopal Church. The third was Dubois Hospital Association, a corporation, owned and operated by another corporation called Sisters of Mercy of Crawford and Erie Counties, composed of members of the Roman Catholic Church. The fourth was Jewish Hospital Association, a corporation, under control of persons of the Jewish faith, but neither the chief physician nor the chief nurse was a Jew. These hospitals, without exception, admitted all persons without distinction as to race, color or religion. There was also involved in this same decision an appropriation to Duquesne University of the Holy Ghost, an incorporated educational institution; it was pointed out that the words ''Holy Ghost'' were used ''in recognition of the relation existing between said corporation and another distinct Catholic organization known as 'The Society of the Holy Ghost,' '' just as the word ''Mercy'' in the corporate title of appellee in the case at bar unquestionably was selected in recognition of the relation existing between appellee and

the Sisters of Mercy, which relation is emphasized by the fact that sixteen times in their brief counsel for appellee have referred to it only as "Mercy Hospital". The Supreme Court of Pennsylvania held that all of these five institutions are sectarian, and said: "There can be no doubt that all the institutions at bar are worthy charities; but it is equally clear they are within the inhibited class, so far as state aid is concerned. We did not write the Constitution; but, whether agreeing with or dissenting from the rules of public policy there announced, our sworn duty is to enforce them. Those who adopted the restriction against appropriating money to sectarian institutions must change the rule, if desired, either through an amendment to the present Constitution or by making a new one. Neither the Legislature, acting alone, nor the courts have power so to do." The court further said in this case ". . . when a charitable, benevolent, or educational establishment is 'denominational or sectarian' according to the meaning of this term as understood by the average man, even though the institution in question may bestow its benefits on others, and permit those outside the ranks of the sect or denomination involved to take part in its management, it is none the less a sectarian or denominational institution."

Section 86 of the Mississippi Constitution says "It shall be the duty of the legislature to provide by law for the treatment and care of the insane; and the legislature may provide for the care of the indigent sick in the hospitals in the state." It will be noted that there is a positive obligation to provide for the treatment and care of the insane, but only a permissive authority to provide for the care of the indigent sick. Now, the controlling opinion emphasizes the fact that this section mentions the hospitals *in* this state and not merely the hospitals *of* this state, but it is a well known rule of constitutional construction that all portions of the constitution must be considered together, each as limiting the other, and if

Section 66 prohibits that which is here sought to be done, then Section 86 cannot authorize it. In Craig v. North Mississippi Community Hospital, 206 Miss. 11, 39 So. (2d) 523, 528, we did not say or hold that the Legislature is under any obligaton to provide for the care of the indigent sick but what we said was that the law providing for the grants-in-aid to nonprofit, nonsectarian hospitals of the state "does bear a reasonable relation to a governmental purpose as expressed in Section 86;" it was nowhere said or intimated that there was an obligation so to do. Furthermore, our holding is boiled down to this conclusion, which certainly is no support for appellee's position here, viz: ". . . We do not hold that the Legisture has the authority to appropriate public funds out of the state treasury for the care of the indigent sick in the nonprofit, nonsectarian hospitals of this state in accordance with the above quoted Section 86 of the Constitution, particularly where the expenditure of such funds for such purpose is under the supervision and control of a state agency." The controlling opinion further quotes from the Craig case "If the end be public, it matters not that it is attained through a private channel", but it must be noted that the channel there mentioned is a private channel and not a sectarian channel.

Adverting to the question of the legislative duty, regardless of whether it be obligatory, to provide for the care of the indigent sick in the hospitals in this state, and whether "*in* this state" means all hospitals, sectarian and otherwise, it is significant to note what was said by the Supreme Court of Pennsylvania in answer to this very question in the case of Collins v. Martin, 290 Pa. 388, 139 A. 122, 125, 55 A. L. R. 311: "Whether the charitable work is compulsory or discretionary, the performance is controlled by the Constitution. No function of government can be discharged in disregard of or in opposition to, the fundamental law. If the performance of the proposed function can be done only in one way and

that way is prohibited by the Constitution, then there can be no function or duty of government relating to the thing to be done. If the function may be performed in two or more ways, one of which is prohibited, then the performance of the function or duty cannot take place in such prohibited way. Overshadowing any proposed exertion of power, there is always the limitation of the Constitution. In this case no money shall be given 'to denominational or sectarian institution, corporation, or association.' It stands as a sentinel in its limited sphere to warn and prevent those in control who may attempt to invade the forbidden ground, and, when attention is directed to their conduct, the Constitution articulates through the courts. The state cannot secure performance of a governmental duty through a medium that has been prohibited from acting.''

The controlling opinion in the case at bar proceeds upon the theory that the grant here in question is neither a gratuity nor a donation for the reason that it is supported by a valuable consideration, to wit, an agreement on the part of appellee to operate a hospital and maintain 10% of its beds for charity patients. The courts have frequently had occasion to deal with such contracts between a state agency and a sectarian institution. For instance, in Collins v. Martin, supra, the very same argument was advanced and the court said in response thereto: ''Even if it be conceded that the arrangement entered into between the department and the hospital represents the purchase of a commodity, the all-important fact still remains that, by virtue of that very arrangement, and payment under the act of 1925, the sectarian institution is enabled to furnish the commodity—care of the indigent sick—and it is thereby enabled to do it as a sectarian institution. It still exists as such, and, even though no profit be made, or though the compensation covers only the cost, or less, the institution is thereby, to that extent, enabled to function as a sectarian institution, and on the people's money.''

The foregoing quotation should be a sufficient answer to the statement in the controlling opinion that "Administering to the sick is not sectarian". There is neither magic nor logic in such a statement and it is of no aid in solving the question before us. By the same token it might be said that care of the orphans or educating the youth of our country is not sectarian and that consequently the treasury may be opened to religious orphanages and schools. The true test, as shown in the last cited case, is whether the use of public funds, regardless of the character of use, by a sectarian institution enables such an institution to function and carry on its work as such.

The case of Synod of Dakota v. State, 2 S. D. 366, 50 N. W. 632, 635, 14 L. R. A. 418, is directly contrary to the contentions of appellee. In that case the Presbyterian Synod operated an educational institution under the name of Pierre University, to which students of all faiths were admitted. The board of education was authorized by the legislature to discharge the state's obligation to train teachers by designating educational institutions where students should be taught the methods and practice of teaching in the common schools and to pay out of the public funds the tuition of the students availing themselves of this educational opportunity. Under the direction of the board of education the university set up and operated a special department known as the "Normal Department" which adopted the course of study prescribed by the board of education and conformed in every respect to its regulations. The university applied for payment of tuition accrued under its contract and upon refusal brought suit against the state to recover it. The constitution of South Dakota, article 6, Section 3, provides that "No money or property of the state shall be given or appropriated for the benefit of any sectarian or religious society or institution" and in denying recovery by the university the Supreme Court of South Dakota

said: "But the learned cousel for plaintiff strenuously contend that the sum due plaintiff will not be contributed for the benfit of or to aid the university, but in payment for services rendered the state, or to its students, in preparing them for teaching in the public schools. This contention, while plausible, is, we think, unsound, and leads to absurd results. If the state can pay the tuition of 25 students, why may it not maintain at the institution all that the institution can accommodate, and thereby support the institution entirely by state funds? The theory contended for by counsel would, in effect, render nugatory the provisions of the constitution, as the claim that the appropriation was made as compensation for services rendered could be made in all cases." The court quoted several of the powers reserved by the board of education in connection with the operation of the Normal Department, and said "But while, by these and other provisions in the law and the regulations, the board of education reserved to itself large powers in the control and management of this department, it nevertheless clearly appears that the teachers in this department were employed and selected by the plaintiff, subject to the approval of the board of education. They were paid by the plaintiff, and under the control of plaintiff as to all matters not specially reserved to the board of education. They constituted a part of the faculty of a sectarian school, and the funds claimed in this action are not to be paid to such teachers specifically, but, if paid, will be received by the plaintiff, and used for its institution. . . . We recognize fully the learning and ability of the faculty of the Pierre University, and the noble work in which they are engaged. We recognize also the faithfulness and fidelity with which the work of instruction was performed under its alleged contract with the board of education, but, with our views of the mandate of the constitution, we are compelled to deny to the plaintiff any relief against the state."

Another case which I think is decisive of some of the questions presented is Cook County v. Chicago Industrial School for Girls, 125 Ill. 540, 18 N. E. 183, 187, 1 L. R. A. 437, 8 Am. St. Rep. 386. Section 3 of Article 8 of the Illinois Constitution Smith-Hurd Stats. provides: ''Neither the general assembly nor any county, city, town, township, school district, or other public corporation, shall ever make any appropriation or pay from any public fund whatever, anything in aid of any church or sectarian purpose, or to help support or sustain any school, academy, seminary, college, university, or other literary or scientific institution, controlled by any church or sectarian denomination whatever; nor shall any grant or donation of land, money, or other personal property ever be made by the state or any such public corporation, to any church, or for any sectarian purpose.'' In the course of about fourteen months 189 girls were adjudged dependent girls under ''An Act to aid industrial schools for girls'', Smith-Hurd Stats. c. 122, Section 646 et seq., and were committed by the county court of Cook County to the Chicago Industrial School for girls, an Illinois corporation. That corporation placed a part of these girls in House of Good Shepherd and the remainder in St. Joseph's Orphan Asylum, both of which were corporations under the control of orders of Sisters of the Roman Catholic Church; it later brought suit against Cook County for the recovery of $10 per month each for furnishing clothing, tuition, maintenance and care for these girls, and upon a recovery thereof the county appealed. The Supreme Court of Illinois unhesitatingly held that the House of the Good Shepherd and St. Joseph's Orphan Asylum, being under control of Sisters of the church ''are necessarily sectarian in their character, and in their objects'' and said: ''A constitutional mandate cannot be circumvented by indirect methods. Under our form of government, church and state are not and never can be united. The former must pursue its

mission without aid from the latter. . . . Any
scheme, even though hallowed by the blessing of the
church, that surges against the will of the people as
crystallized into their organic law, must break in pieces
as breaks the foam of the sea against the rock on the
shore.''

It is interesting to note that the controlling opinion
herein merely brushes aside the last cited case with
the statement that the aforesaid provision of the Illinois
Constitution is not couched in the same language 'as
Section 66 of the Mississippi Constitution, and it is
startling that the controlling opinion then says that the
Illinois Supreme Court ''could not have found that the
appropriation was in violation of the latter part of such
constitutional provision, for the reason that it was not a
'gratuity or donation.' '' The quoted statement is an
almost verbatim replica from the brief for appellee here-
in and most assuredly could not have been made from a
close study of the Cook County case, supra, for therein
the Illinois Supreme Court very plainly held to the con-
trary when it said:

''It is strenuously contended by counsel that Section
3 was only intended to prohibit gifts or donations, and
that it refers to 'state support, gifts by way of aid,' and
'appropriations to be used by managers of religious insti-
tutions, without restraint or liability to account.' The
theory seems to be that, even if the two institutions are
controlled by a church, and are to be the recipients of
all the money paid to appellee, yet neither they nor their
purposes are aided by such payment, provided only there
is a consideration for the money paid. It is said that
these institutions furnish tuition and clothing in return
for the money received by them; and that, as they earn
what they get, and are not the recipients of any gift or
donation, nothing is paid in their 'aid,' 'or to help sup-
port or sustain' them. The refused propositions assert
the contrary of the view thus contended for.

. . . . . .

"It cannot be said that a contribution is no aid to an institution because such contribution is made in return for services rendered or work done. A school is aided by the patronage of its pupils, even if they do pay for their tuition. Because the customers of a merchant pay for their goods, it is none the less true that his business is aided by their custom. The act under discussion is entitled 'An act to aid industrial schools for girls.' If the payment by the county of $10 per month on account of each dependent girl committed to such a school is no aid to the school, simply because 'tuition, maintenance, and care' are furnished in return for such payment then the act is not properly entitled.

"The doctrine here contended for is an exceedingly dangerous one. In County of McLean v. Humphreys, 104 Ill. 378, it is intimated by this court that the state is under obligations to protect and educate such classes of female infants as were declared to be dependent girls by section 3 of the act of May 28, 1879, as that section stood before it was amended on June 26, 1885. Under this view, the industrial schools which teach and care for such girls are performing, as substitutes for the state, a duty which the state itself is bound to perform. If they are entitled to be paid out of the public funds, even though they are under the control of sectarian denominations, simply because they relieve the state of a burden which it would otherwise be itself required to bear, then there is nothing to prevent all public education from becoming subjected, by hasty and unwise legislation, to sectarian influences. By section 1 of article 8 of the constitution it is made the duty of the state to provide a thorough and efficient system of free schools.

"If statutes are passed under which the management of these schools shall get into the hands of sectarian institutions, then, under the theory contended for, the prohibition of the constitution will be powerless to prevent the money of the taxpayers from being used to

support such institutions, inasmuch as they will render a service to the state by performing for it its duty of educating the children of the people. It is an untenable position that public funds may be paid out to help support sectarian schools, provided only such schools shall render a *quid pro quo* for the payments made to them. *The constitution declares against the use of public funds to aid sectarian schools, independently of the question whether there is or is not a consideration furnished in return for the funds so used.*" (Emphasis supplied.)

Summarizing the holding of the Illinois court it was that a contribution of public funds cannot be justified merely because it was in furtherance or aid of an obligation which the state owes to its citizens, and this is true regardless of whether there is or is not a consideration furnished for the funds so used, and it is still a contribution even though there may be value received therefor.

The salient principles of law quoted from the numerous authorities hereinbefore mentioned are all brushed aside in the controlling opinion, as they were in the brief for appellee, with the simple statement that the constitutional provisions of these various states are not couched in the same language as Section 66 of our own Constitution. The case of Bradfield v. Roberts, 175 U. S. 291, 20 S.Ct. 121, 123, 44 L.Ed. 168, which the controlling opinion says is decisive of the question before us might also be brushed aside by the same process of reasoning because the only constitutional provision there involved was that portion of the first amendment to the Constitution of the United States which provides "Congress shall make no law respecting an establishment of religion." But the facts in that case were that Providence Hospital, there in question, a corporation domiciled in the District of Columbia and created by an Act of Congress wherein Congress specifically reserved the

right to amend, alter or repeal the charter at any time, entered into a contract with the Commissioners of the District of Columbia whereby the commissioners agreed to erect at their expense on the grounds of the hospital an isolation building or ward for the treatment of minor contagious diseases, two thirds of the capacity was to be reserved for charity patients sent there by the commissioners for which they would pay the hospital $250 per annum per patient. The suit was to enjoin the payment of any funds to the hospital and turned wholly upon a demurrer which challenged the sufficiency of the allegations of the complaint. It was claimed that the contract violated the above quoted provision of the first amendment, and the court said: ''If we were to assume, for the purpose of this question only, that under this appropriation an agreement with a religious corporation of the tenor of this agreement would be invalid, as resulting indirectly in the passage of an act respecting an establishment of religion, we are unable to see that the complainant in his bill shows that the corporation is of the kind described, but on the contrary he has clearly shown that it is not.'' In the report of this case a copy of the Act creating the corporation is set out and it shows that the incorporators were acting in their individual capacity and not as Sisters of Mercy or as members of any particular religious faith. The court further said: ''As stated in the opinion of the court of appeals, this corporation 'is not declared the trustee of any church or religious society. Its property is to be acquired in its own name and for its own purposes; that property and its business are to be managed in its own way, subject to no visitation, supervision, or control by any ecclesiastical authority, whatever, but only to that of the government which created it. In respect, then, of its creation, organization, management, and ownership of property it is an ordinary private corporation whose rights are determinable by the law of the land, and the

religious opinions of whose members are not subjects of inquiry.' '' It was held that even if the incorporators were all of one religious faith they did not so act in obtaining the charter and there was nothing in the federal constitution which prohibited the making of the contract. That decision is a far cry from what we now have before us here. The appellee in this case is owned outright by the Sisters of Mercy who are prohibited by the laws of their church from holding anything except as trustees for the church; its governing board is composed of five members of the Sisters of Mercy, and the constitutional limitation, later to be discussed, is wholly different from that which was under consideration in Bradfield v. Roberts, supra.

The controlling opinion cites the case of Chance v. Mississippi State Textbook Rating & Purchasing Board, 190 Miss. 453, 200 So. 706, 713, and says that therein this court took high ground on the question as to what is meant by the separation of church and state. Let us analyze that ''high ground''. The Chance case had under consideration the question whether Chapter 202, Laws of 1940, violated Section 208 of the Mississippi Constitution which provides: ''No religious or other sect or sects shall ever control any part of the school or other educational funds of this state; nor shall any funds be appropriated toward the support of any sectarian school, or to any school that at the time of receiving such appropriation is not conducted as a free school.'' The court pointed out in its opinion that under Section 23 of said Chapter 202, Laws of 1940, it was provided that ''This act is intended to furnish a plan for the adoption, purchase, distribution, care and use of free textbooks *to be loaned to the pupils* in the elementary schools of Mississippi. The books herein provided by the board shall be distributed and *loaned free of cost to the children* . . .''. The court also pointed out that the books were not purchased out of the school funds of the state

but by a special appropriation from the state's general funds, and its entire holding is summed up in these words: "The books belong to, and are controlled by, the state; they are *merely loaned to the individual pupil* therein designated; their preservation is fostered by exaction of suitable compensation for their loss or damage; . . . Nor is the *loaning of such books* under such circumstances *to the individual pupils* a direct or indirect aid to the respective schools which they attend, although school attendance is compulsory. Such pupil is free to attend a proper public or private school, sectarian or otherwise." (Emphasis supplied.) The court took great care to point out in its opinion that under the free school book law the books were not donated or loaned to private or parochial schools but were merely loaned to that class of pupils who were required under the compulsory school law to attend school, the pupils or their parents were required to return the books or pay for their loss or damage, and the pupils under our compulsory law were free to attend any public, private or parochial school which met the standards of the State Board of Education.

The controlling opinion also cites Bedford County Hospital et al. v. Browning, Tenn. Sup., 225 S. W. (2d) 41, and quotes only one sentence therefrom. An examination of that case shows that Tennessee had adopted a statute similar to that of Mississippi whereby that state formulated a state wide hospital program so that it might take advantage of the provisions for hospital aid made by the Hill-Burton Federal Act, 42 U. S. C. A. Section 291 et seq. Several Tennessee hospitals qualified for grants under this law, and the opinion clearly shows that not a single one of them was operated by any religious sect. There was no question of a sectarian use of the funds, but the sole contention was that the Tennessee Constitution, article 2, Section 31, which provides "The credit of this State shall not be hereafter loaned or given to or in aid of

any person, association, company, corporation, or municipality;" prohibited the grants to these hospitals which were of four classes: (1) Those owned and operated exclusively by counties, (2) Those owned solely by municipal corporations, (3) Those owned jointly by county and city, and (4) Those owned by nonprofit general welfare corporations. It will be noted that the quoted section of the Tennessee Constitution is very similar to Section 258 of the Mississippi Constitution which provides. "The credit of the state shall not be pledged or loaned in aid of any person, association, or corporation" and which we held in the Craig case, supra, did not prohibit an appropriation out of the state treasury in furtherance of the statewide hospital program even though a part of such appropriation might be allocated by the Mississippi Commission on Hospital Care to nonprofit nonsectarian hospitals of this state. The Tennessee court quoted from and followed the Craig case, but nowhere was there any intimation or suggestion that any sectarian hospital was involved.

I have herein above discussed every case, save one, which is cited in the controlling opinion as dealing with the constitutional question involved and in all sincerity I believe that not one of them supports the conclusion therein reached. The only case which even remotely tends to support it is Kentucky Building Commission v. Effron, 310 Ky. 355, 220 S. W. (2d) 836, in which there was raised the constitutionality of the Kentucky statutes creating a statewide hospital program similar to that of Mississippi. It was contended that grants to a hospital whose board of trustees were all of the Episcopalian faith and another hospital whose trustees were all of the Catholic faith were in violation of Section 5 of the Kentucky Constitution which provides "No preference shall ever be given by law to any religious sect, society or denomination; nor to any particular creed, mode of worship or system of ecclesiastical polity." This is quite

similar to Section 18 of the Mississippi Constitution which provides that "No religious test as a qualification for office shall be required; and no preference shall be given by law to any religious sect or mode of worship; but the free enjoyment of all religious sentiments and the different modes of worship shall be held sacred." Nobody even contends in the case at bar that the said Section 18 would prohibit the grant here in question; on the contrary, the sole contention is that Section 66 is violated. Kentucky has no constitutional provision similar to Section 66 of the Mississippi Constitution, and if our said Section 18 were the only obstacle in the way of the grant here in question I would readily concede, as the Kentucky Court of Appeals held, that it does not prohibit the grant. Since Kentucky has no constitutional provision even remotely similar to our said section 66, the decision furnishes no rule for our guidance and is no earthly authority one way or the other for an interpretation of Section 66, and it is significant to here note that in the Kentucky decision there is not cited one single case from any other jurisdiction. Moreover, if we should apply to the Kentucky case the same rule which the controlling opinion applies to the cases from other jurisdictions herein cited, i. e., that the case is no authority because the constitutional provisions are not identical, then we would be compelled to discard it just as the controlling opinion discards all the authorities from other jurisdictions upon which appellant relies.

Coming now to the provisions of Section 66 of our Constitution, it provides that "No law granting a donation or gratuity in favor of any person or object shall be enacted . . . for a sectarian purpose or use." It will be noted that this section uses the word "donation" and the word "gratuity" in the disjunctive, but the controlling opinion treats them as if they mean exactly the same thing. Thereby the framers of the Constitution are held to have used superfluous words,

but the law is that "In construing a constitutional provision effect must be given to every word in it." Trahan v. State Highway Commission, 169 Miss. 732, 749, 151 So. 178, 181. Webster's New International Dictionary defines "gratuity" as "Something given freely or without recompense." So, when the element of consideration for services to be rendered enters into the matter, we may concede that the grant here in question is not a gratuity. But, since the section also uses the word "donation", we must assume that its authors intended to prohibit something besides a mere gratuity as just defined,—something which does not fall into the classification of "something given freely and without recompense." The same dictionary defines "donation" as "Act of giving or bestowing; a grant," and it gives as synonyms "gift, benefaction, grant." By the very statute under which the transfer of this money to certain institutions is authorized, Chapter 430, Laws of 1948, such transfer is called a "grant". Webster defines a grant as "A gift or bestowal by one having control or authority over it, as of land, money, or a privilege by the government." It is thus seen that a grant and a donation are one and the same thing, and, since a donation for a sectarian purpose or use is prohibited, then it must necessarily follow that a grant is also prohibited. It is argued, however, that the grant in this case is not a donation because it is said that it is made in consideration of services to to be rendered by appellee in the maintenance for 20 years of 10% of its beds for charity patients. However, it has been held that the mere fact of the existence of a consideration does not change the character of a donation. This was held in the case of Fisk v. Flores, 43 Tex. 340, 344, where it is said: "It is also quite evident that it is entirely consistent with the nature of a title by 'donation' that the donor may be moved, by reason of services rendered by the donee, to make the donation, and that it is induced by such consideration does not

take from the transaction the character of a 'donation'.'' Under these authorities it is quite clear that a grant and a donation are synonymous, and that the grant here in question falls within the definition of ''donation'' as used in the Constitution.

The controlling opinion takes from Bouvier's Law Dictionary one of the definitions of ''donation'', but when we lift mere definitions from court opinions (as is done throughout in Bouvier) it is always necessary to go to the entire opinion to see just what facts the court had under consideration. It is possible to prove almost anything by quoting some brief passage from the Bible where the connecting passages are ignored. I have given Webster's definition of ''grant'' and ''donation'' from which it appears that the two words are used interchangeably, and it must be remembered that we are here dealing with what the statute calls a ''grant''. It is a well settled rule governing constitutional interpretations that ''The court will look to the dominant object to be accomplished by the constitutional provisions rather than to a literal or technical interpretation.'' W. Horace Williams Co. v. Federal Credit Co., 198 Miss. 111, 119, 21 So.(2d) 582, 583. Is it not proper to inquire what was the dominant object to be accomplished by Section 66? Clearly it was intended to maintain inviolate the separation of church and state and to prevent the grant of public funds to the use of a sectarian institution. Those who framed the constitution came from all walks of life; some were lawyers, some were business men, some were farmers. Many were not skilled in legal phraseology or definitions taken from court opinions; they adopted language in its ordinary understanding and interpretation. ''Subtility and refinement and astuteness are not admissible to explain away an expression of the sovereign will. The framers of the constitution, and the people who adopted it, must be understood to have intended the words employed in that sense most likely

to arise from them on first reading them." Adams v. Yazoo & M. V. R. Co., 77 Miss. 194, 274, 24 So. 200, 317, 319, 28 So. 956, 60 L. R. A. 33. "A Constitution is framed for the guidance and government of the whole people, and words used therein are to be given their usual and popular signification and meaning; and, unless that be the manifest intention of the framers of the instrument, phrases or terms susceptible of two different interpretations are not usually to be given a restricted, narrow, or technical construction." State v. Mobile J. & K. C. R. Co., 86 Miss. 172, 190, 38 So. 732, 735, 122 Am. St. R. 277. "Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the use of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them; the people adopt them; the people must be supposed to read them with the help of common sense, and cannot be presumed to admit in them any recondite meaning or extraordinary gloss." Story, Constitutions, Sec. 451.

From these authorities it is plain that the word "donation" as used in our Constitution, construed in the light of Webster's definition, which is certainly the common understanding and popular signification and meaning, is one and the same thing as "grant" and that this is true regardless of whether there is or is not a consideration therefor. It must be remembered that we are dealing with the word "grant" as a noun and not a verb, and, as I see it, the reference to the word when used as a verb in the conveying clause of a deed, as is done in the controlling opinion, is wholly beside the point.

The next question is whether such grant or donation is for a sectarian purpose or use; if it is, then it is prohibited. Section 66 says "for a sectarian purpose or use". Again we have two words in the disjunctive and we must so

construe the provision as to give effect to both of these words. Conceding for the moment that a sectarian purpose might be interpreted to mean in furtherance of the promotion of the sect, we are still confronted with the fact that those who framed the Constitution intended to cover something more than the word "purpose" else they would not have also written therein the word "use". This word can mean nothing except a use by a sect or sectarian institution, and it is self-evident that that is exactly what was meant.

I will not extensively belabor further the question whether appellee is a sectarian institution. All its stock is owned by the corporation Sisters of Mercy as such and not by its members as mere individuals; all its directors are and must be members of the Sisters of Mercy in their capacity as such members and not as mere individuals. In fact the controlling opinion herein suggests, and I do not question it, that in view of the long and honorable record of sacrificial service of the Sisters of Mercy *they* will continue to operate the proposed hospital for the additional seventeen years after expiration of appellee's charter in 1953, but the fact remains undisputed that the Sisters of Mercy is a religious institution composed of members of one sect and pledged and devoted to furthering the principles of that sect under the absolute and complete control and dominion of the head of that sect. That appellee is a sectarian institution and that its successor after expiration of its charter will continue to be a sectarian institution cannot be successfully denied. Hence I must register my dissent from the conclusion in the controlling opinion that the grant in question is not for a sectarian use. As to whether it is, in fact, for such a use, let us briefly review some of the expressions in the decisions cited herein:

State ex rel. Nevada Orphan Asylum v. Hallock, supra; "The $75.00 appropriated for each orphan is a contribution only. Should it be given it would be used for the relief and support of a sectarian institution, and in part,

at least, for sectarian purposes. Should it be admitted that it would be used in part for legitimate purposes, still, it is impossible to separate the legitimate use from that which is forbidden.''

Bennett v. City of LaGrange, supra [153 Ga. 428, 112 S. E. 486]: The contract gave ''a great advantage and the most substantial aid to the Salvation Army in the prosecution of its benevolent and religious purposes. The giving of loaves and fishes is a powerful instrumentality in the successful prosecution of the work of a sectarian institution.''

Collins v. Martin, supra [290 Pa. 388, 139 A. 127]: ''Even if it be conceded that the arrangement entered into between the department and the hospital represents the purchase of a commodity, the all-important fact still remains that, by virtue of that very arrangement, and payment under the act of 1925, the sectarian institution is enabled to furnish the commodity—care of the indigent sick—and it is thereby enabled to do it as a sectarian institution. It still exists as such, and, even though no profit be made, or though the compensation covers only the cost, or less, the institution is thereby, to that extent, enabled to function as a sectarian institution, and on the people's money.''

Synod of Dakota v. State, supra [2 S. D. 366, 50 N. W. 637]: ''But while . . . the board of education reserved to itself large powers in the control and management of this department, it nevertheless clearly appears that the teachers in this department were employed and selected by the plaintiff, subject to the approval of the board of education. They were paid by the plaintiff, and under the control of plaintiff as to all matters not specially reserved to the board of education. They constituted a part of the faculty of a sectarian school, and the funds claimed in this action are not to be paid to such teachers specifically, but, if paid, will be received by the plaintiff, and used for its institution.''

Cook County v. Chicago Industrial School for Girls, supra [125 Ill. 540, 18 N. E. 197] : "It cannot be said that a contribution is no aid to an institution because such contribution is made in return for services rendered or work done. . . . It is an untenable position that public funds may pe paid out to help support sectarian schools, provided only such schools shall render a *quid pro quo* for the payments made to them."

I make no apology for the length of this opinion. The amount of money involved is far greater than in any other case since my tenure of office began, and the principle involved is even more important than the question of money. I am firmly convinced that the men who framed our Constitution never intended that public funds should ever be used by any sectarian institution in the manner which is approved by the majority of the court in this case.

**Lee, J.,** joins in this dissent.

## On Suggestion of Error

### Alexander, J.

In recognition of the searching analyses in the suggestion of error and because of the importance of the issues involved, specific inquiries were propounded by the Court. All of these matters but one were raised and given attention in our former opinion and stressed by able and conscientious dissent but re-examination was invited by the following inquiries:

1. In view of the existence of outstanding capital stock in the sum of $50,000, can Mercy Hospital—Street Memorial quality as a "nonprofit corporation"? In this connection a reconciliation between Code 1942, Section 5310 and Section 6, Chapter 363, Laws of 1946, as amended, was invited. The former section contemplates that charitable associations, churches, religious societies and the like may be incorporated without the issuance of stock.

It is prospective; the corporation, to be thereafter organized, "shall issue no shares of stock". The latter citation brings into view the Act of February 18, 1948, Laws 1948, c. 430, in which Chapter 363 of the Laws of 1946 was amended so as to identify those institutions qualified to receive grants-in-aid. To the original designation of those only which were publicly owned and operated by the state or a subdivision thereof, recognition of existing corporations was had by including also "these nonprofit institutions owned and operated by a corporation or association no part of the net earnings of which inures, or may lawfully inure, to the benefit of any private shareholder, group or individual."

The courts of other states together with our own state, have uniformly defined charitable corporations as those which issue no stock and make no provision for individual profit. But we are not reading into our statute a general definition. It is specific and controls the area in which the state may function. It is part of the statute itself which employs no such generality as "charitable organization" or "nonprofit corporation", but defines the permissible recipients in the language quoted.

It is the view of the appellant that there are only two types of corporations under our law, those which issue stock and are organized for profit, and those which are nonprofit and issue no stock. Thus appellee is alleged to be of a hybrid status. Whereupon appellant insists that it is not a nonprofit institution because it has stock outstanding, and appellee says that the Act of 1948 recognizes the possibility that there may be outstanding stock in a nonprofit corporation and urges that despite the incident of stock certificates the appellee is a nonprofit institution because it does not, and cannot under the law and its charter, allow any of its profits to inure to the benefit of any shareholder.

We know of no law which would require a conventional corporation which qualifies for tax exemption or grants-in-aid to destroy outstanding stock certificates.

It is certainly true that this translation from a profit to a nonprofit association renders the stock inert save for voting purposes and accords to it only a competency to identify the holders of the legal title to the property. Appellee is not, because it is nonprofit, of necessity charitable. Its earnings may prove to be substantial. This will be of concern to the State only as a guaranty of the continuance of the public service which it has promoted. But such earnings must be plowed back into the corporation.

From the view point of the State it matters not that in the meantime the present and ultimate ownership is in those whose title is evidenced by so-called stock certificates or otherwise. All property is under the ownership of some person or body. The attribute which qualifies the appellee for the grant is that, "in all functions which are part of the state hospital plan", it is in fact and by law, by charter, and by its contract with the Commission a nonprofit institution under the supervision of the commission. Cf. Brister v. Leflore County, 156 Miss. 240, 125 So. 816. Let the certificates be lost, there is still a residual ownership, made effective upon ultimate dissolution. Woodville Lodge, etc., v. Poole, 190 Miss. 798, 1 So. (2d) 780. Let the certificates be assigned without the Commission's approval, to another person or corporation with or without a capital gain by the present owners, or be restored to a profit status, and thereupon the entire hospital property is transfixed by a lien in favor of the State to guarantee the reasonable amount of its grant. Ch. 430, Laws 1948; Par. 6(b) of the application agreement.

Despite insistence to the contrary no part of the net earnings or appellee can "inure, to the benefit of any private shareholder" at least for the next twenty years. We are not moved by the argument that the net earnings, by their very absorption into the institution, and its equipment and its enlargement, are thus safely im-

pounded against the day when there will be, upon dissolution or expiration, a dramatic division of accrued capital gains. The greater the earnings thus turned back into equipment the greater will be the assurance of the Commission that its wisdom, in devolving this responsibility upon appellee, has been vindicated.

The state is content to reap a harvest of public welfare and service for twenty years. In computing the benefits accruing to the State we must put out of view such grants as may be made by the Federal Government. The outlay by the State is $214,000 toward a total expenditure of $1,350,000. The Federal Government is to pay $527,000 and the remainder is supplied by the hospital. The consideration to the State must, therefore, be valued by the reasonably anticipated facilities furnished over a twenty year period, against the background of the State's grant of $214,000. If there is only a reasonable public demand for charity beds and services, the benefit to the State, by minimum bases of computation, will far exceed its outlay. So that the State is not donating money but purchasing, with no little thrift, benefits for its indigent patients. We shall not enlarge upon nor change the views expressed in our former opinion.

2. Our next inquiry is: ▊▊▊ Does paragraph 5 (c) of the contract between the hospital and the Commission contemplate that the obligation of the former to maintain the hospital facilities extends only two years? This paragraph is as follows: ''In the event the hospital and/or other facilities involved in this project as fully described and set forth in said original application should operate at a loss during the first two years after the same is/are ready to begin operations, the applicant will and does hereby underwrite the cost of such operations for such period and will provide funds and make up any such operation deficit; such funds to be provided from funds on hand and available for such purposes or to be raised and so provided by lawful means at the disposal of the applicant.''

Under the provisions of Chapter 430, Laws of 1948, the Commission on Hospital Care is required and authorized to examine and adjudicate whether the applicant is a qualified institution and whether "the sources of funds for the permanent maintenance of the hospital is (sic) adequate to insure the hospital's continued efficient maintenance and operation". To this end the contract between the parties requires appellee to underwrite the cost of such operations for a minimum of two years. But what of its obligation thereafter? Apart from the reasonable assumption that a hospital which has maintained itself for forty-seven years will under these substantial grants continue to do so, there is the definite obligation, made as part of its application, which makes forfeit its entire property to secure the grant if it should without approval dispose of its property or cease to be a nonprofit institution.

As to the possibility of some future application to the state for aid to make up an operating deficit it is a sufficient answer that the purpose of our present law is not maintenance but construction. The application filed by the hospital and approved by the Commission was "for the purpose of building a new hospital of 150 bed capacity at Vicksburg."

To the assurance of appellee in its brief that it is not entitled to and did not and does not contemplate application for aid in maintenance, the appellant replies that this concession or undertaking is ex parte and informal. However, we integrate this concession, conforming as it does to our construction of the applicable statutes, into our opinion. Such view is made a condition of our affirmance and must be the settled law of this case.

3. Our third query is: ██ ██ Does the contract with the Mercy Hospital—Street Memorial contemplate the use of state funds to reimburse the hospital for charity patients or other maintenance costs?

The arguments based upon an assumed obligation of the state to reimburse the hospital for the care of charity

patients brought into ominous view such cases as Bennett v. City of La Grange, 153 Ga. 428, 112 S. E. 482, 22 A. L. R. 1312; Collins v. Martin, 290 Pa. 388, 139 A. 122, 55 A. L. R. 311; and Synod of Dakota v. State, 2 S. D. 366, 50 N. W. 632, 14 L. R. A. 418, cited in the dissenting opinion.

The contention posed a problem which could not justly be ignored and which could not be solved by the subtle logarithms of sophistry. We need not enter this arena of conflict for the following reasons. (1) Under the contract with the Commission, the hospital has agreed to furnish up to ten per cent of its bed capacity free to indigent patients; (2) Section 7134, Code 1942, forbids any reimbursement to any hospital located in the same county where a state charity hospital is located. We take notice that there is such charity hospital in Warren County; (3) there is no authority in the Mississippi Commission on Hospital Care to make such reimbursement; (4) the appellee concedes and agrees as part of its contention that no such reimbursement can or will be requested.

To these contentions the learned Attorney General replies that by virtue of recent enabling legislation the charity hospital is subject to sale or abandonment; that the so-called agreement of appellee is unilateral and has no sound basis for enforcement.

To the latter contention we add that it is an assumption by this Court and a condition of its affirmance that such reimbursement is not permissible under existing law. This conclusion therefore constitutes part of the law of this case.

Our fourth inquiry is: ▋▋ Does the contract here involved, which provides for the maintenance of teaching facilities, violate the prohibition of Section 208 of our Constitution. This Section is as follows: "No religious or other sect or sects shall ever control any part of the school or other educational funds of this state; nor shall any funds be appropriated toward the support of any sectarian school, or to any school that at the time of re-

ceiving such appropriation is not conducted as a free school."

We could not forbid a subsequent inauguration of such facilities by the hospital if it had not bound itself to furnish them in the first instance, nor could such installations retroactively invalidate a grant made in their absence. These services approach more closely a donation to the state than does the grant for construction constitute an appropriation of funds for the support of a sectarian school.

People of State of Illinois ex rel. McCollum v. Board of Education, 333 U. S. 203, 68 S. Ct. 461, 92 L. Ed. 648, 649, 2 A. L. R. (2d) 1338, is not controlling.

We repeat that the grant is only for construction and not maintenance. Such contemplated training is an incident, yet an important one, in the over-all plan to render such hospital an efficient aid in its duty to furnish hospital care. There is nothing in the record to indicate that such facilities are either a "school" or are "sectarian". The maintenance of such facilities are at the sole expense of the hospital but under the control and supervision of the Commission. No "part of the school funds" is granted.

Under Section (j) of the contract it is provided that "the hospital will contribute funds, equipment and personnel which it may have available or can make available for such purposes toward the promotion and carrying on of a state wide program of nursing education to be inaugurated and carried on by the Commission in cooperation with participating hospitals, all to the extent and in the manner provided and contemplated by the terms of House Bill No. 430, Mississippi Laws of 1946, as amended."

It may be stated that this contention is noticed because of its importance and in spite of the fact that it is pressed for the first time upon a suggestion of error.

5 Our last inquiry is: ▮▮▮ Does section (j) of the contract constitute an obligation to carry out the purposes of the Act and the directions of the Commission or con-

stitute merely an undertaking to do so only to the extent of its ability?

The text of this section, quoted above, provides for the "carrying on of a state wide program of nursing education to be inaugurated and carried on by the Commission with participating hospitals, all to the extent and manner provided and contemplated by the terms of House Bill 430 (Chap. 363), Mississippi Laws of 1946." Only co-operation by the hospital is required. As repeatedly stated, the grant is for construction. The hospital has not been required to set up and guarantee maintenance of a particular standard of nursing education. This policy is to be established by the Commission. We see no vitiating significance in the undertaking by the hospital to make contributions and to extend co-operation to the extent of its ability. This is the language of high purpose and good faith and is not intended as the exigible terms of a solemn engagement. It is indefinite only to the extent that its future financial resources are not presently foreseeable, nor are the demands and requirements of the Commission standardized.

. We need add only that to expand our discussion of . these several contentions would be but a repetition of the conclusions and the supporting authorities found in our original opinion.

For emphasis, it is again asserted that the concessions and disavowals of appellee in reply to our inquiries numbered two, three and four, to which we assent as being in accord with the law, are integrated into our opinion as a reinforcement of our declaration that the assertions of the appellee now become not only a condition of our affirmance but the settled law of this case.

Overruled.

**McGehee, C. J.,** (concurring).

I am unable to agree with the dissenting view that the sum of $741,000 is the proper basis for determining

whether or not the State is to receive a substantially adequate consideration in return for the funds allocated by the Mississippi Commission on Hospital Care to the Mercy Hospital—Street Memorial, or rather for determining whether the consideration to be received by the State is so grossly inadequate as to amount to a donation. The amount of state funds allocated by the Commission in this case is $214,000 and not $741,000, the sum of $527,000 of the total amount being federal funds, as shown by all the proof in the record.

As to the opinions written by me on behalf of the Court in the cases of State ex rel. McCullen, Land Commissioner, v. Adams, 185 Miss. 606, 188 So. 551, wherein it was held that a consideration of $160 paid for state lands worth $1,600 was so grossly inadequate as to ''virtually'' amount to a donation; in Koonce v. Board of Sup'rs. of Grenada County, 202 Miss. 473, 37 So. (2d) 264, 456, wherein we held the same thing as to the sum of $300 paid for timber worth some $4,000 to $5,000; and in State ex rel. Kyle, Attorney General v. Dear, Miss., 46 So. (2d) 100, not yet recorded in State Reports, wherein a consideration of $500 was paid for sixteenth section timber which soon thereafter sold for $4,000, and which were all sales for grossly inadequate considerations and therefore void, I deem it sufficient to say that the philosophy of those decisions is that if a purchaser is permitted to obtain public lands, or sixteenth section timber, for such grossly inadequate considerations it would amount to either a legal or an actual fraud, whereas in the case now before us there is no contention whatever made by the appellant that the obtaining of an allocation by the appellee hospital of $214,000 in consideration of the benefits to be received by the State in the care of the indigent sick would amount to either a legal or an actual fraud, but, on the other hand, the proof discloses that the considerations to be received in the treatment of charity patients, training of internes, etc., in return for the $214,000 over a period of twenty years is not grossly

inadequate, but is fully adequate; and there is no issue of legal or actual fraud involved.

I reaffirm my faith in the correctness of the decisions hereinbefore mentioned, which are discussed in the dissenting opinion, and maintain that there is no departure being taken in the controlling opinions in the present case from the rule announced by the Court in those cases.

It is to be conceded that prior to the enactment of Chap. 430, Laws 1948, under which this allocation of funds was made, the Legislature had defined a nonprofit corporation in the manner stated in the dissenting opinion on this Suggestion of Error, and also that such a corporation had been likewise defined in numerous decisions of various courts, as pointed out and discussed at length in the dissenting opinion now being rendered, but it is pertinent to observe that in the enactment of Chap. 430, Laws 1948, the Legislature had full power and authority to define a nonprofit hospital *within the meaning of that Act* in such language as the Legislature saw fit to define it. It so happened that the Legislature did define the privately owned hospitals that were entitled to participate in the hospital program as being "those nonprofit institutions owned and operated by a corporation or association no part of the *net earnings* of which inures, or may lawfully inure, to the benefit of any private shareholder, group or individual." (Emphasis supplied.)

In my opinion, the proof discloses without dispute that the hospital involved in the case now before us comes fully and completely within the above definition, which is the same definition given under the Federal Act, 42 U. S. C. A. Section 291 et seq., to nonprofit hospitals that are to participate in the nation-wide hospital program. The rule that the Legislature has the power to define terms which it uses in a statute is, in my opinion, too well-settled in this State to require the citation of authorities to support it. We have repeatedly recognized this right of the Legislature in our construction of the State Sales

Tax Law and various other statutes involved in decisions rendered by us too numerous to be here enumerated.

I fully concur in the view that none of the new points raised for the first time in the Suggestion of Error in this case are well taken.

I shall not write more than what is above stated, for the reason that my views are fully stated in the controlling opinion written by me for the Court on April 24, 1950, and reported in Miss., 45 So. (2d) 809, and which opinion could have well ended at the conclusion of paragraph twenty-six thereof, since the remainder of the same is therein acknowledged to be mere dicta written only for the purpose of discussing the other matters particularly emphasized in the dissenting opinion then written.

**Hall, J.** (dissenting).

Dissenting opinions are seldom written on suggestions of error, but I am impelled to again register my protest against the action of the court in this case. The principles involved are so far-reaching and the decision so wholly contrary to my conception of the applicable law that I feel a further dissent is justified. I shall endeavor to avoid needless repetition of what has been previously written by me and to confine this dissent to additional reasons in support of the conclusions heretofore advanced.

It is my opinion that the appellee is not a nonprofit corporation, and since the controlling opinion herein concedes that a majority of the court knows of no law which would require a stock corporation to destroy its outstanding stock before it can qualify as a nonprofit institution and cites no law to support its conclusion, I shall endeavor to present some of the authorities and to show that the translation of a stock corporation to a nonprofit corporation does not render the stock inert save for voting purposes as asserted in the controlling opinion herein.

Our law specifically provides that a nonprofit corporation shall issue no shares of stock, Section 5310, Code of 1942, and yet this corporation has $50,000 of stock outstanding. The Sisters of Mercy acquired every physical asset of the hospital by the mere transfer of these shares of stock to it at par value. This separate corporation, Sisters of Mercy, holds title to those shares of stock in its own name as a corporate entity. It must be admitted that there is no legal obstacle which would prevent the Sisters of Mercy from selling those shares of stock to any other person, firm or corporation at a profit. This is said without any idea of imputing bad faith to the Sisters of Mercy, but it illustrates quite forcefully what could be done with a corporation such as appellee which declares that it is not operated for profit and which could nevertheless make a profit for its stockholders by the simple expedient of selling the shares of stock without disturbing in any manner appellee's corporate entity. It was to avoid the possibility of just such an event that our Legislature specially provided that nonprofit corporations "shall issue no shares of stock, shall divide no dividends or profits among their members," etc. The legislature did not intend that a nonprofit corporation should issue any shares of stock for the very patent reason that if it did issue capital stock the same could easily be made the subject of barter and trade and the law could thereby be circumvented. The law prohibits not only the declaring of dividends but also the making of profits, and if a corporation's structure is such that its stockholders could make a profit by the sale of stock it does not and cannot be in truth and in fact a nonprofit corporation.

Let us consider in this connection what has already occurred in appellee's corporate structure. It was organized in 1903 as a stock corporation for profit under the name of Vicksburg Sanitarium. In 1918 it undertook to obtain exemption of its property from taxation and this court held that it was not entitled to such exemp-

tion because it was not a nonprofit or charitable corporation. Mayor & Aldermen of City of Vicksburg Sanitarium, 117 Miss. 709, 78 So. 702. In 1933, a competing institution, with a similar name, in the same city, viz., Vicksburg Hospital, Inc., amended its charter so as to classify itself for tax exemption purposes as a charitable or nonprofit corporation, and upon allowance of such exemption by the circuit court the matter came to this court on appeal and a decision was rendered on September 23, 1935, holding that it was entitled to such exemption. See Board of Supervisors of Warren County v. Vicksburg Hospital, Inc., 173 Miss. 805, 163 So. 382. The question of outstanding capital stock was not involved in the decision. On October 21, 1935, this court overruled a suggestion of error in the case last mentioned and *on that very same day* the appellee herein had its charter amended so as to declare itself a nonprofit corporation; however, its stockholders did not surrender their shares of capital stock so as to come within the provisions of our statute, but tenaciously held the same; they did not give up their investment to the cause of charity; they had an original investment of $50,000 in the appellee corporation, and they retained their shares of stock evidencing this investment until 1943 when they sold the same to Sisters of Mercy at par. Thereby they recovered every dollar of their original investment, and just as easily they could have sold their stock certificates for two or three times its par value if they had found a purchaser at that price. Since the sale of this stock to Sisters of Mercy there has been no change whatever in the appellee's corporate structure except that by charter amendment its name has been changed to Mercy Hospital—Street Memorial. The holders of that stock today have the legal right to sell it at a profit.

The authorities are numerous as well as unanimous in holding that a nonprofit or charitable organization shall issue no shares of stock. It would unduly extend this

dissent to cite all the cases on the subject, but I mention a few wherein the principle is unequivocally announced and wherein scores of others are cited. So far as I can find there is not one single decision to the contrary except the two controlling opinions in the case at bar.

In Congregational Sunday School & Publishing Society v. Board of Review, 290 Ill. 108, 125 N. E. 7, 10, it was held: "The principal and distinctive features of a charitable organization are that it has no capital stock and no provision for making dividends or profits". This was quoted verbatim in People ex rel. Hellyer v. Morton, 373 Ill. 72, 25 N. E. (2d) 504.

In People v. Y. M. C. A. of Chicago, 365 Ill., 118, 6 N. E. (2d) 166, 167, 169, it was said: "The principal and distinctive features of a charitable organization are that it has no capital stock and no provision for making dividends or profits for private gain."

The opinion in Stearns v. Association of the Bar of City of New York, 154 Misc. 71, 276 N. Y. S. 390, 394, in discussing charitable or nonprofit organizations said: "Their principal and distinctive features are that they have no capital stock and no provision for making dividends or profits".

The case of Baptist Hospital v. City of Nashville, 156 Tenn. 589, 3 S. W. (2d) 1059, 1060, involved a claim for tax exemption by the hospital as a charitable or nonprofit corporation, and the Supreme Court of Tennessee said: "Their principal and distinctive features are that they have no capital stock and no provision for making dividends or profits".

In Farm & Home Savings & Loan Ass'n. of Missouri v. Armstrong, 337 Mo. 349, 85 S. W. (2d) 461, 467, the Supreme Court of Missouri said: "Under the weight of authoritative decisions, Hardin College is classifiable as a charitable educational corporation. The distinctive features of a charitable corporation are that it has no capital stock and no provisions for dividends or profits".

In the case of In re Coleman's Estate, 66 Idaho 567, 163 P. (2d) 847, 848, it was held: "The distinctive features of a charitable organization are that it has no capital stock and no provision for making dividends or profits". This was cited with approval and quoted verbatim by the Supreme Court of Wyoming in Town of Cody v. Buffalo Bill Memorial Ass'n, 64 Wyo. 468, 196 P. (2d) 369.

In Southern Methodist Hospital and Sanatorium of Tucson v. Wilson, 45 Ariz. 507, 46 P. (2d) 118, 119, it was said: "when charity is to be extended, not sporadically and to a few individuals, but to a large number over a long period of time, it is generally administered by some association, corporation, or institution, and principal and distinctive features of institutions of this character are that they have no capital stock and no provisions for making dividends or profits".

Cases by the dozen following the above quoted views may be found in 11 C. J. p. 304, Note 67, and the supplemental Corpus Juris Annotations, 14 C. J. S., Charities, Section 2. It is established everywhere except in Mississippi that a nonprofit corporation cannot issue any shares of corporate stock and this is for the reasons hereinabove discussed, and yet the two controlling opinions in the case at bar hold outright that the outstanding stock of appellee corporation is of no import in determining whether or not it is a nonprofit corporation. With due deference, I am reminded of the title of the song which was quite popular during World War I, —"They Were All Out of Step but Jim."

The original controlling opinion herein quotes at length from the bylaws adopted by appellee just two days before approval of its application by the Mississippi Commission on Hospital Care and plants a goodly portion of its decision upon the recitals in those bylaws which, as pointed out in my original dissent, may be repealed or amended at any time. I contended then and still

contend that the bylaws are not properly to be considered in determining appellee's status as a nonprofit corporation. There is abundant support for my position. In the case of Gitzhoffen v. Sisters of Holy Cross Hospital Ass'n, 32 Utah 46, 88 P. 691, 695, 8 L. R. A., N. S., 1161, it is said: "It has been quite generally held that the nature of the corporation must be determined from its articles of association, and that its character cannot be changed or modified by parol evidence; that the object and purpose for which a corporation is organized must be gathered alone from the written instrument, and it cannot be aided or varied or contradicted by testimony or averments aliunde the instrument itself. Craig v. Benedictine Sisters Hosp. Ass'n., 88 Min. 535, 93 N. W. 669; Gould v. Fuller, 79 Minn. 414, 82 N. W. 673; People ex rel. State Bd. of Charities v. New York Society for Prevention of Cruelty to Children, 161 N. Y. 233, 55 N. E. 1063; Atty. Gen. v. Lorman, 59 Mich. 157, 26 N. W. 311, 60 Am. Rep. 287; Detroit Driving Club v. Fitzgerald, 109 Mich. 670, 67 N. W. 899; City of Kalamazoo v. Kalamazoo Heat, Light & Power Co., 124 Mich. 74, 82 N. W. 811; State v. New Orleans Water Supply Co., 111 La. 1049, 36 So. 117; 1 Clark & Marsh. on Corporations, Section 36h; 3 Ency. p. 615.

The case from which I have just quoted involved a suit for damages in tort against the hospital corporation which defended upon the ground that it was a non-profit and charitable corporation and hence not subject to liability in such a suit. The trial court sustained this position but the Supreme Court of Utah reversed it on the ground that the very charter of incorporation showed that it had outstanding shares of capital stock. In this connection the court said: "The law under which the defendant was organized required that the objects of the corporation should be fully set out in the articles of incorporation. This was done by the defendant. . . . The law further required that, if the corporation is organ-

ized for pecuniary profit, it must set forth in its articles the amount of the capital stock and the number of shares into which the same is to be divided, with the amount of each share, which shall not exceed $100. This the defendant did by stating its capital stock to be $10,000, divided into 10,000 shares of $1 each. The principal features of charitable corporations are 'that they have no capital stock, and that their members can derive no profit from them.' 6 Cyc. 974, McDonald v. Mass. Gen. Hospital, 120 Mass. 432, 21 Am. Rep. 529.'' It will be noted that the stated requirements of the Utah statute are almost exactly like the requirements of our statute, Section 5310, Code of 1942. On the trial of the case the lower court admitted evidence tending to show that the hospital was not in truth and in fact operated for profit, and the Supreme Court of Utah, after discussing this action, said: ''We are therefore of the opinion that the court erred in admitting the testimony referred to. Looking at the articles themselves, we are also of the opinion that the purpose of the association, as therein disclosed, is for pecuniary profit, and not charity.''

In Sussex Trust Co. v. Beebe Hospital of Sussex, Inc., 25 Del. Ch. 172, 15 A. (2d) 246, 247, the court had under consideration the question whether the hospital was a nonprofit corporation so as to be entitled to benefits under a will, and the court pointed out only the provision of the charter which authorized the issuance of corporate stock, and said:

''Although some of its purposes are of a charitable nature, the certificate of incorporation, upon its face, purports to create an organization for pecuniary profit. Article 4 of the certificate provides:

'' 'The amount of the total authorized capital stock of this corporation is Ten Thousand Dollars ($10,000.00) divided into One Hundred (100) shares of the par value of One Hundred Dollars ($100.00) each.

'' 'The amount of capital stock with which this corporation will commence business is One Thousand Dollars'.

"There is nothing in the charter to prevent participation in corporate profits by private shareholders. It is when income may be applied to the profit of the founders or shareholders that 'business has a beginning and charity an end'. Butterworth v. Keeler, 219 N. Y. 446, 114 N. E. 803, 804. Such an organization is not a charity. William Budge Memorial Hospital v. Maughan, 79 Utah 516, 3 P. (2d) 258, 13 P. (2d) 1119; Stratton v. Physio-Medical College, 140 Mass. 505, 21 N. E. 874, 5 L. R. A. 33, 14 Am. St. Rep 442; 2 Restatement of the Law of Trusts, Section 376; 2 Bogert on Trusts and Trustees, Section 365; 3 Scott on Trusts, Section 376."

The case of William Budge Memorial Hospital v. Maughan, 79 Utah 516, 3 P. (2d) 258, 262, 13 P. (2d) 1119, involved a claim for tax exemption on the ground that the hospital was a charitable corporation. It was organized in 1914 and up to the time of the trial in 1928 it had never paid out any dividends to its stockholders, but all profits had been used for increasing its hospital facilities. The Supreme Court of Utah pointed out that the corporation had $50,000 outstanding capital stock and said:

"It is also urged in behalf of the plaintiff that the hospital was never carried on for pecuniary profit for the reason that no dividends were ever declared or paid to the stockholders and none were declared or paid for the year 1928.

"The fact that the managing directors of a hospital operated for profit deemed it advisable to permit the earnings of the institution to accumulate and then appropriate such funds into buildings and equipment for the benefit of the hospital, rather than to pay them out as dividends to the stockholders, is not necessarily indicative of either a benevolent or charitable purpose. It often is in line with sound business principles to withhold dividends and convert the money into increased facilities of the institution. Certainly every stockholder is pecuniarily

benefited. His holdings in the corporation are enhanced in value. The management which dictated such a policy, in the course of years, when the plant had increased in value to considerable proportions, largely because it was not burdened by the payment of taxes, might be able to dictate a dissolution of the corporation, to the immense profit of all the stockholders.''

A petition for rehearing was filed in the last cited case and disposing of the same the Supreme Court of Utah said in 13 P. (2d) 1119: ''Plaintiff corporation, as shown by its articles of incorporation, was organized for profit. Its property was used for the purposes mentioned in its articles of incorporation, and hence the use to which the property was put was likewise for profit and not for charitable purposes. The mere fact that the profits derived from conducting the hospital were used for its enlargement rather than disbursed to the stockholders in dividends did not change the character of the use to which the property of plaintiff corporation was put. *Increasing the assets of the corporation and hence the value of the stock held by its stockholders is in no sense a charitable purpose.''* (Emphasis supplied.)

Upon the expiration of appellee's charter of incorporation all of its property will become vested in Sisters of Mercy, a sectarian corporation which owns all its outstanding stock. The sole stockholders will reap the benefit of every dollar of increase in value of appellee's assets and will thereby indirectly make a profit on its investment while urgently proclaiming to this court that it is a nonprofit corporation because it has not declared any dividends to its stockholders. Furthermore the stockholders may in the meantime sell their shares of stock for more than par value and thereby make a profit without declaring any dividends. I confess that I am intellectually unable to follow the controlling opinion in its conclusion on this point. Under the plain provisions of the statute which authorizes grants to hospitals, no hospital can

qualify to receive it unless such hospital is a nonprofit organization under our laws. Chapter 430, Laws of 1948, specifically limits the grants to two classes of hospitals, viz., (a) those which are publicly owned and operated by the state or a political subdivision thereof, and (b) "those nonprofit institutions owned and operated by a corporation or association no part of the net earnings of which inures, *or may lawfully inure*, to the benefit of any private shareholder, group or individual." (Emphasis supplied.) Here the earnings of appellee, accumulated in its surplus from time to time by increase of its assets, not only "may lawfully inure" but will positively inure, when its charter expires, to the benefit of Sisters of Mercy, or their assigns, or if, in the meantime, the shares of stock are sold for profit, the excess of the sale price over par value will likewise inure to the stockholders. Thus in either of two ways a part or all of the net earnings of appellee may lawfully inure to a private shareholder, which fact under the very terms of the statute disqualifies appellee from receiving the grant in question.

But it is said in the controlling opinion on suggestion of error, without the citation of any authority, that if the stock certificates be assigned without the approval of the Commission on Hospital Care, either with or without a capital gain to the present owners, the entire property is thereupon transfixed by a lien in favor of the state to guarantee the reasonable amount of its grant, whereupon the conclusion is reached that for at least the next twenty years no part of the net earnings can possibly inure to the benefit of any shareholder. I disagree with both the premise and the conclusion. The only law for a lien in favor of the state is found in Chapter 430, Laws of 1948, which provides that if any hospital or institution to which funds have been paid shall at any time within twenty years be sold or transferred to any person, agency or organization which is not qualified

to receive a grant in aid or which is not approved as a transferee by the commission, or ceases to be a nonprofit institution, then a lien in favor of the state shall attach to the property. The contract here involved is between the commission and Mercy Hospital—Street Memorial, a corporation. By no stretch of the imagination can a transfer of the shares of stock in that corporation change its status as a separate legal entity; if this were the case, then every stock exchange in the country would be forced to close today. In 18 C. J. S., Corporations, Section 5, p. 370, it is said: ''The existence of a corporation is unaffected by changes in its membership, or by the death, or incapacity of, its members.'' And in 13 Am. Jur. p. 157, Corporations, Sec. 6, it is said: ''A corporation is for most purposes an entity distinct from its individual members or stockholders who, as natural persons, are merged in the corporate identity, and remains unchanged and unaffected in its identity by changes in its individual membership.'' A transfer of all or any portion of appellee's corporate stock cannot in any manner affect its corporate identity or its contract with the Commission on Hospital Care and cannot impose any lien upon its property. Under the specific terms of said Chapter 430, Laws of 1948, there is no provision for a lien to the state upon a mere transfer of corporate stock.

In my opinion the grant in this case is a donation, and in this connection there is hardly any ground for argument as to the amount of the donation. The majority opinion on the suggestion of error points out that the state's share of this grant is a mere $214,000, and that the federal government is putting up an additional $527,000 to bring the total up to $741,000, but what that opinion fails to take into consideration is that the federal government has turned over to the Mississippi Commission on Hospital Care a large sum of money to be used in the state's hospital construction program,

and these federal funds are under the control of the Commission to be disbursed in accordance with the law, and if this amount of $527,000 federal funds were not donated to appellee it would not be turned back into the federal treasury but would remain under control of the state and could be used in constructing other hospitals which qualify for grants under the law. This $537,000 was not plucked off a gravy train nor left by Santa Claus on a Christmas tree. It is nothing but public funds, taken from the pockets of the taxpayers, and turned over to the Commission for distribution to the public hospitals of Mississippi. The amount of the grant is $741,000 and no sort of mathematical gymnastics can change it.

The concurring opinion rendered herein upon the original consideration of this case states that appellee's new hospital is to have 175 wards and that the hospital contracts to use and maintain 10% of such wards for charity patients for twenty years. This figure was taken from appellee's brief which is not supported by one word in the record. The record shows that appellee proposes to erect a hospital of 150 beds,—not 175 wards. Upon the original consideration of this case the court proceeded upon the assumption that the appellee had contracted and agreed to keep 10% of these beds constantly occupied by charity patients, at its own expense, for a period of twenty years. Such is absolutely not the case. Its entire obligation to the state is set out in its application for this grant of $741,000 of public funds. That application contains this obligation: ''In the event the hospital and/or other facilities involved in this project as fully described and set forth in said original application should operate at a loss during the first two years after the same is/are ready to begin operations, the applicant will and does hereby underwrite the cost of such operations *for such period* and will provide funds and make up the operation deficit; such funds to be provided from funds on hand and available for such purposes or to

be raised and so provided by lawful means at the disposal of the applicant.'' Here the appellee obligated itself to operate this hospital without aid from the state for a period of two years and no longer. The rate fixed by the legislature for charity patients in private hospitals at the time of approval of the grant in question was $4 per day, Ch. 378, Laws of 1946; since approval of the grant it has been raised ''not to exceed $6.00 per day'', H. B. No. 994, Laws of 1950, but the appropriation by the legislature for the next biennium still limits the outlay to $4.00 per day per patient as heretofore. The controlling opinion herein asserts that if there is only a reasonable public demand for charity beds and services, the benefit to the state, by minimum bases of computation, will far exceed its outlay, but the opinion carefully refrains from disclosing any figures to sustain such a conclusion. As heretofore pointed out, appellee proposes to erect a hospital with 150 beds and to make 10%, or 15 of these, available for charity patients who are eligible and qualify under the per capita fund for charity hospitalization. If every one of these beds is occupied by a charity patient every day in the year there would be a saving to the state of $21,900 per year at the rate of $4.00 per day. This is the rate which must be used because the state can obtain the same facilities and services to charity patients from numerous other hospitals at that price. For the two years for which appellee has contracted to take care of these patients at its own expense, this would be a total saving of $43,800 for the $741,000 outlay. However, appellee concedes in its brief that the daily average occupancy of charity beds will probably be approximately 75%; this reduces the saving to $16,425 per year or a total of $32,850 for the two year period, which is approximately two forty-fourths of the entire grant. But if appellee maintains these charity beds and takes care of the charity patients at its own expense in accordance with the conclusion of the majority for the full period of

twenty years (which will be hereinafter discussed) then the saving to the state will still be only $16,425 per year, which is only 2.2% of the total outlay; thus the state will obtain an income of 2.2% per annum on its investment and will lose the principal thereof. This may be a thrifty business deal for the state, as concluded by the majority of the court, but it is a transaction which would certainly have no appeal to a financier in the investment world.

The controlling opinion on sugggestion of error says that "Under the contract with the Commission, the hospital has agreed to furnish up to ten per cent of its bed capacity free to indigent patients". With the utmost deference, I challenge a quotation from the contract to this effect. Aside from the paragraph last above quoted wherein appellee is obligated to underwrite the cost .of operation and maintenance for two years and no longer, the only other obligation to charity patients contained in the application and contract is this: "That at all times at least ten per cent of the bed capacity of the hospital shall be made available as charity facilities for the use of charity patients qualified under State Charity Hospitalization, Section 7130, Code of 1942, and amendments thereto and under other laws on the subject." This obligation is of course limited to a period of twenty years for by the terms of the contract and the statute everything provided by this $741,000 grant is free from all lien of the state for a breach thereof after twenty years. Now under the first quoted provisions the appellee is obligated to furnish the facilities at its own expense and out of its own funds for a period of only two years, and when it obligates to make 10% of its bed capacity available for the use of charity patients there is not included in this obligation that it will care for these patients at its own expense and out of its own funds. The very law which authorizes grants to nonprofit hospitals, Ch. 430, Laws of 1948, in the last paragraph pro-

vides: "The commission shall require said hospitals to maintain at least ten per cent (10%) of its bed capacity if needed for charity patients who are eligible *and qualify under the per capita fund for charity hospitalization.*" (Emphasis supplied.) The same provision is found in the last paragraph of Sec. 6, Ch. 363, Laws of 1946, which was amended by said Ch. 430, Laws of 1948.

The whole organization for administration of the per capita fund for charity hospitalization is set out in Sections 7130-7146 of the Code of 1942, where there was created in 1936 the State Hospital Commission to which was vested this duty, and which Commission is not to be confused with the Mississippi Commission on Hospital Care created by Ch. 363, Laws of 1946. Appropriations to the per capita fund for charity hospitalization are made by the Legislature every two years and are administered by the State Hospital Commission,—not by the Mississippi Commission on Hospital Care. There is nothing whatsoever in said Ch. 363, Laws of 1946, or Ch. 430, Laws of 1948, manifesting any intention of the Legislature to abandon appropriations for said per capita fund which have been regularly made since 1936.

Section 12 of Ch. 363, Laws of 1946, authorizes a disposition of the five charity hospitals now owned and operated by the state, and it is contemplated that under the state-wide hospital program these five hospitals will be disposed of or abandoned in due course. And while at the present moment appellee could not qualify to participate in the state-wide charity hospitalization fund because one of the charity hospitals owned by the state is situated in the same county as appellee's hospital, it is quite manifest that as soon as the State Charity Hospital in Vicksburg is abandoned or disposed of as specifically contemplated by said Section 12, there will no longer remain any obstacle to prevent appellee from participating in the distribution of state funds for the care of charity patients. The controlling opinion says that the

appellee concedes and agrees as a part of its contention that no such reimbursement can or will be requested; this assertion by the court is based solely upon these statements of its counsel in his brief on the suggestion of error: "Mercy Hospital does not now or ever contemplate an application to the Commission for maintenance. Mercy Hospital expects to and will permanently maintain itself, and the Commission has found that it is capable of doing so. . . . Neither the statutes nor the contract contemplate any reimbursement to Mercy Hospital for charity patients. Mercy Hospital certainly expects no such reimbursement. The question could not possibly arise in the present status of the laws or the contract."

Appellee's counsel was referring to the Mississippi Commission on Hospital Care. That commission did not exact of appellee any sort of agreement that it would not receive per capita charity hospitalization funds after the expiration of two years, but, on the contrary, was very careful to provide in the contract that appellee should underwrite the entire expense of operation for two years and no longer. With no imputation whatsoever of bad faith upon the part of appellee in this matter, and viewing the question solely upon the basis of its legal right to apply for a grant of such funds for the care of charity patients after the expiration of two years, there is absolutely nothing to prevent it from obtaining such a grant from the State Hospital Commission, an entirely different agency of the state, after closing of the State Charity Hospital at Vicksburg; Senate Bill No. 499, Laws of 1950, specifically authorizes the State Hospital Commission to disburse the charity hospitalization funds "to those counties in the state in which state supported charity hospitals are not operated" and as soon as the State Charity Hospital at Vicksburg ceases to operate, as it assuredly must under the provisions of Section 12, Chapter 363, Laws of 1946, the door is wide open for

appellee to participate in the distribution of these funds. The statement of its counsel, made for the first time in the brief on suggestion of error, that it has no intention of so applying, is not a binding obligation, and certainly this court has no.legal right to impose as a condition of affirmance an obligation that it shall not so apply. Such a condition of affirmance is nothing short of a rewriting of appellee's contract with the state so as to insert an additional contractual obligation therein without its consent, and is a procedure, so far as I can find, that is wholly unheard of in the jurisprudence of this state.

Under the first quoted paragraph of the contract the appellee is definitely obligated to operate the hospital with its own funds for two years. If it were contemplated that after two years the 10% of beds were to accommodate charity patients at the expense of the hospital, then why did not the contract so state? After the expiration of two years the beds are to be made available as charity facilities for the use only of those charity patients who can qualify for participation in the per capita fund to be appropriated biennially by the legislature out of the state treasury. That is exactly what is written into the very law which authorizes a grant to private nonprofit hospitals and which is referred to in the provision of the contract last above quoted. From the whole contract the only reasonable conclusion is that the state will be expected to pay for the maintenance of charity patients out of the per capita fund. I readily concede that the Mississippi Commission on Hospital Care has no authority to obligate the state to provide a per capita fund out of which payments will be made for charity patients, but the point is that appellee is not obligated to take care of a single charity patient after two years unless the state does make such funds available 'to it. It is certainly true that the appellee has not bound itself to take care of these patients at its own expense and out of its own funds; its only ob-

ligation in that respect is limited to two years, and if it were not contemplated that it was to be reimbursed out of the per capita fund for charity patients, why indeed does the second quoted paragraph of the contract make direct reference to charity patients who are qualified under the regulations pertaining to that fund, and why does Sec. 6 of Ch. 363, Laws of 1946, make reference to this 10% bed capacity, " if needed for charity patients who are eligible and qualify under the per capita fund for charity hospitalization"? And why does Ch. 430 of the Laws of 1948 contain precisely the same provisions in exactly the same language? Undoubtedly it is contemplated and expected that after two years the appellee will share in the per capita fund if it takes care of any charity patients. Therefore we fall back to the proposition that at most, if every charity bed is filled with a charity patient for every day of the two years to which appellee is obligated, the state will receive in services rendered to its charity patients $43,800 for a consideration of $741,000. In my opinion, under the decisions of this court, this consideration is not inadequate as to amount to a donation.

In State ex rel. McCullen, Land Commissioner, v. Adams, 185 Miss. 606, 188 So. 551, in an opinion written by the present Chief Justice, it was held that a consideration of $160 paid for state lands worth $1,600 was so inadequate as to amount to no consideration, and the patent from the state to the purchaser was held void.

In State ex rel. McCullen, Land Commissioner, v. Tate, 188 Miss. 865, 196 So. 755, 756, this court had under consideration a similar state of facts and held a state patent void, and in so doing, speaking through Judge Griffith, said: "This matter of the sufficiency of the consideration for a patent to state tax forfeited land was fully explored in Slay v. Lowery, 152 Miss. 356, 119 So. 819, and the report of that case shows that the judges were all in agreement that a patent for a grossly inadequate con-

sideration cannot be allowed; that such a transaction would be in contravention of the provisions of Section 95, Constitution 1890, which prohibits the donation, directly or indirectly, to individuals or to corporations, of any of the lands belonging to, or under the control of the state.''

Later, in Koonce v. Board of Sup'rs. of Grenada County, 202 Miss. 473, 32 So. (2d) 264, 265, 456, in an opinion written by the present Chief Justice, where timber on sixteenth section school lands worth $4000 to $5000 was sold for $300, it was held that the transaction was void because the consideration was so inadequate as to amount to a donation in contravention of Section 95 of the Constitution, and in this connection the court said: ''. . . the Board of Supervisors had no right to sell this trust property, which it was administering as an agency of the State on behalf of the educable children of the township in the capacity of a trustee, at such a grossly inadequate price in violation of Section 95 of the State Constitution, which prevents 'lands belonging to, or under the control of the state (from being) donated directly or indirectly, to private corporations or individuals,' etc.'' The Court then cited with approval State ex rel. McCullen v. Tate, supra.

In State v. Roell, 192 Miss. 873, 7 So. (2d) 867 in an opinion written by the present Chief Justice, it was reiterated that a purchase price for state lands may be so inadequate as to amount to a donation in contravention of Section 95 of the Constitution.

In spite of these decisions the majority of the court held in the case at bar, on April 24, 1950, with reference to the word ''donation'' as used in Section 66 of the Constitution, that ''. . . only one meaning can be ascribed to the word 'donation'—a transfer of the property from the owner to another *without any consideration in return*''. (Emphasis supplied.) [45 So. (2d) 815.]

Only two weeks later, a majority of this same court, speaking through the same Chief Justice, in the case of State ex rel. Kyle v. Dear, Miss., 46 So. (2d) 100, not yet reported in the State Reports, held that a conveyance of timber on sixteenth section lands for a consideration of $500 when it later sold for $4000 constituted a "donation" within the meaning of Section 95 of the Constitution, which provides, in part: "Lands belonging to, or under the control of the state, shall never be donated directly or indirectly, to private corporations or individuals . . . ." Consistency in decisions is highly desirable, and yet in the case at bar it is held that a donation is without any consideration whatsoever, when that word is used in Section 66 of the Constitution, while in the five other cases hereinabove last cited it was held that a donation under Section 95 of the same Constitution is effected where there is a transfer of property for an inadequate consideration. In other words, the position of the majority herein is that when the framers of our Constitution used the word "donation" in Section 66 they meant one thing, and when the same framers used the same word just twenty-nine sections later it meant an entirely different thing.

Now, if, as held in the foregoing authorities, a donation may result from an inadequate consideration, it is well to examine the consideration for the $741,000 grant in this case, and when that is done we find that the only return which is absolutely assured to the state over the two year period is a maximum of $43,800, or approximately one-seventeenth of the grant, while in State ex rel. Kyle v. Dear, supra, a conveyance for one-eighth of the true value was held to be so inadequate as to constitute a donation. I cannot bring myself into accord with such a vacillating position. If the grant in the Dear case, and the others which follow the same pattern, was a donation, then the grant to appellee must of necessity likewise be a donation, if it is a donation, it violates Section 66 of the Constitution and should not be permitted to stand.

In my opinion the grant in this case is expressly prohibited by Section 208 of the Mississippi Constitution. While this point was raised for the first time on suggestion of error, the court makes no unusual concession in giving it consideration but has precedent for such action. Mars v. Germany, 135 Miss. 387, 100 So. 23. The constitutional section just mentioned provides: ''No religious or other sect or sects shall ever control any part of the school or educational funds of this state; nor shall any funds be appropriated toward the support of any sectarian school, or to any school that at the time of receiving such appropriation is not conducted as a free school.'' Stripping this section of its inapplicable part and reducing it to that portion which I think is violated by this grant, we have ''nor shall any funds be appropriated . . . to any school that at the time of receiving such appropriation is not conducted as a free school.'' Let it be noted that this section does not apply alone to elementary schools or grammer schools or high schools, but to ''any school''.

The original charter of incorporation, approved in 1903, declares the purposes of appellee corporation to be twofold, viz., (1) to construct, maintain and operate a sanitarium for the treatment of sick or injured persons, and (2) ''to maintain in connection therewith a training school for nurses.'' That was when appellee was admittedly a corporation organized for profit. When the charter was amended in 1935 the purposes were declared to be (1) to construct, maintain and operate a hospital or sanitarium for the treatment of sick or injured persons and (2) ''and to provide, maintain and operate in connection therewith, and as a part of said hospital or sanitarium, a training school and home for nurses.'' This portion of the charter has never since been altered in any manner. Thus it is seen that the avowed purpose of appellee for forty-seven years has been and still is to provide, maintain and operate a training school for

nurses in connection with and as a part of its hospital. In Section 7 of appellee's bylaws, adopted just two days before approval of the grant in question, it was declared that the Hospital Administrative Board created by the bylaws "shall give all possible assistance towards the proper functioning and operation of a school of nursing for the education of nurses." Each time the appellee mentioned the training of nurses it called the program a school. This is a school conducted by appellee in its hospital and (quoting from its charter) "as a part of said hospital". Appellee is both a hospital and a school, and the aforesaid solemn declarations of its charter and bylaws should not be confused with that portion of its contract with the Commission on Hospital Care designated as paragraph (j) and quoted in the majority opinion on the suggestion of error wherein it further agreed to contribute such funds, equipment and personnel as it may have available in co-operation with said Commission and the other hospitals of the state in carrying on a state-wide program of nursing education to be hereafter inaugurated by the Commission. Paragraph (j) of the contract refers only to the state-wide program of nursing education to be set up and conducted by the Commission on Hospital Care and does not in any manner deal with or refer to the school for the education of nurses conducted by appellee in connection with and as a part of its hospital. The majority opinion says there is nothing in the record to indicate that such facilities are either a school or are sectarian. I will not further discuss the sectarian feature for the reason that it is fully covered in my original dissent and for the further reason that Section 208 of the Constitution prohibits any funds from being appropriated to the support of any school which is not conducted as a free school regardless of whether it is or is not sectarian. As to whether the record shows that appellee's facilities for the education of nurses is a school, there appear in the record three docu-

ments,—(1) the original charter of incorporation, (2) the 1935 amendment thereto, and (3) the bylaws adopted by appellee on October 8, 1949, while its application was pending for the grant in question and just two days before final approval of said grant, and in each and every one of these instruments the appellee itself referred to its program for the education of nurses as a school. Since the appellee repeatedly designated this portion of its corporate functions as a school, I am unable to follow the majority in holding that it is not a school.

The majority opinion further says in justification of its conclusion that no part of the school funds is granted by the commission. Said Section 208 begins with a prohibition against the control of any part of the school funds of the state by any religious sect; I have never contended that the appropriation to appellee is out of the school funds, but I do contend that the last portion of Section 208 prohibits the appropriation of "any funds . . . to any school (sectarian or otherwise) that at the time of receiving such appropriation is not conducted as a free school." This covers institutions such as Gulf Park College, Gulf Coast Military Academy, and many others throughout the state, which are not controlled by or connected with any religious sect.

The majority opinion furthermore repeatedly points out that the grant here in question is for construction only and is not for maintenance. I must confess that I cannot see where this makes any difference so far as the constitution is concerned; it prohibits the appropriation of any funds to any school that is not operated as a free school regardless of whether such funds are for construction or for maintenance. Appellee makes no contention that its nursing school is a free school. According to this portion of the conclusions of the majority of the court, the constitution would not be violated by the appropriation of $741,000 to Gulf Park College, or even church owned schools such as Millsaps College, Missis-

sippi College, Belhaven College, and the numerous parochial schools of the state, so long as such appropriation is for the construction of buildings and not for maintenance. By the same token the Legislature could appropriate unlimited money to any religious denomination for the erection of new churches throughout the state so long as the money is used for construction purposes and not for the operating expenses of such churches. It is startling that the court would try to make a distinction between construction costs and maintenance costs without citing a single authority or precedent. It seems to me that the distinction is wholly imaginary and is supported by neither logic nor reason, and will rise to plague us in the future.

For the reasons hereinabove given, as well as those set out in my original dissent, I respectfully dissent from the court's action in overruling the suggestion or error.

**Lee, J.**, joins in this dissent.